THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DONALD HIGGINS, Defendant-Appellant.

First District (4th Division)   No. 76-1455

Opinion filed May 3, 1979.

James Doherty, Public Defender, of Chicago (John M. Kalnins and James L. Rhodes, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Iris E. Sholder, and Mary Ellen Cagney, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendant, Donald Higgins, was found guilty of armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—2) and aggravated battery (Ill. Rev. Stat. 1977, ch. 38, par. 12—4). He was sentenced to a term of 7 to 21 years for armed robbery and to a term of 2 to 6 years for aggravated battery, the sentences to run concurrently.

On appeal, defendant contends: (1) the trial court committed prejudicial error in refusing to consolidate three separate indictments for a single jury trial; (2) the trial court erred in restricting the examination of three defense witnesses; (3) the State committed prejudicial error when it failed to comply with the discovery requirements of Supreme Court Rule 412(a)(vi) (Ill. Rev. Stat. 1977, ch. 110A, par. 412(a)(vi)); (4) the State committed prejudicial error when it elicited from defendant on cross-examination the fact that a potential defense witness was in jail at the time of trial; (5) the trial court compounded the previous error when it refused to allow defendant to disclose the circumstances surrounding the arrest of the potential defense witness; and (6) the defendant was improperly convicted for both aggravated battery and armed robbery.

We affirm the trial court.

Three separate indictments charged the defendant with robbing employees of the Irving Hotel on August 28, September 1, and September 28, 1974, while armed with a dangerous weapon. Although the record is not entirely clear as to the substance of all three indictments, it does disclose the following:

*1st Indictment*

| | |
|---|---|
| Charge: | Armed Robbery |
| Offenders: | Defendant & Larry Thompson |
| Place: | Irving Hotel |
| Date: | August 28, 1974 |
| Victim: | Desk clerk Lonnie Sartin |
| Eyewitnesses: | None |

*2nd Indictment*

| | |
|---|---|
| Charge: | Armed Robbery |
| Offenders: | Defendant & Larry Thompson |
| Place: | Irving Hotel |
| Date: | September 1, 1974 |
| Victim: | Desk clerk Lonnie Sartin |
| Eyewitness: | Gussie Sanders |

*3rd Indictment*

| | |
|---|---|
| Charges: | Armed Robbery & Aggravated Battery |
| Offender: | Defendant |
| Place: | Irving Hotel |
| Date: | September 28, 1974 |
| Victim: | Desk clerk Mattie Johnson |
| Eyewitness: | Gussie Sanders |

Defendant presented to the trial court an oral motion to consolidate all three indictments for a single jury trial. In support of this motion, defendant's attorney stated:

"The place of the alleged armed robberies are all the same. The victims and witnesses by and large are all the same, and the police officers involved are all the same. Our defense, without disclosing and without prejudicing my client, if the Court would take my record, similar defense to the entire set of transactions, it would not be a question of disputing one or admitting one. It would be a question of one singular defense to all three transactions."

Defendant's attorney chose not to reveal the nature of the alleged defense which was similar to all three indictments. The only explanation offered was that "the defense would basically be the witnesses are lying for a reason."

In its response to defendant's motion for consolidation, the State argued: (1) that each armed robbery was a separate and distinct offense; and (2) that there was nothing to indicate a continuous course of conduct was involved. Following arguments of counsel, the trial court denied defendant's motion for consolidation. The State then elected to prosecute the defendant on the third indictment, which involved the September 28, 1974, armed robbery and aggravated battery charges.

In its discovery motion, the defense requested that the State disclose any prior criminal convictions "of those persons it intends to call as witnesses at trial." Prior to selection of the jury, the defense asked the State for its answer to discovery. The State informed the trial court and

the defense that the discovery answer was being typed up and would be available as soon as it was completed.[1]

Defense counsel then explained to the trial court why he had requested the criminal histories of the State's witnesses:

"[I]t would be unlikely I would get any response from the Police Department because I don't have any information other than their names and last known addresses. I have issued a subpoena in an attempt to try to do so. I hope before the witnesses, any state's witnesses or some of those witnesses take the stand, that the State would endeavor to make every effort to get their criminal history for me."

The trial court responded by stating:

"As soon as the witnesses are available I would be glad, on the record or provide you with the time to do so off the record, to inquire of each witness whether or not they have a criminal record.

You may also obtain their address, social security number and any other identifying information to assist you in that way.

Mr. Goldberg: Thank you."

At trial, Gussie Sanders testified that in September 1974 she worked as a maid in the Irving Hotel at 5615 South Prairie Avenue, Chicago, Illinois. On September 28, 1974, at approximately 1:45 a.m. Ms. Sanders was on duty and was standing in the hotel lobby. Mattie Johnson, the hotel clerk, was working in a nearby office.

A man, later identified as the defendant, appeared outside the glass lobby door with a gun wrapped in a suede coat. Defendant ordered Ms. Sanders to open the door. When she refused, the defendant kicked the door and broke the glass.

Ms. Sanders ran into the hotel office, slammed the door and held it shut while Ms. Johnson phoned the police. Defendant kicked the office door open, rushed in and with his gun struck Ms. Johnson above the left eye, knocking her to the floor. Defendant asked Ms. Johnson "for the key so he could get the money." Ms. Johnson responded: "[T]he key is hanging on the rack." Defendant grabbed the key, unlocked a drawer and "got the money out." After ordering Ms. Sanders and Ms. Johnson to lie flat on the floor for five minutes, defendant walked out the door.

Ms. Sanders testified that the defendant had been a tenant in the Irving Hotel six weeks prior to the robbery. She knew the defendant by two names, Donald Higgins and Donald Jackson. When police arrived shortly after the robbery, Ms. Sanders informed them that Donald Higgins, the defendant, had robbed Ms. Johnson. Later that same morning, at approximately 5 a.m., the police returned to the hotel with

---

[1] In its discovery answer the prosecution stated: "The State has no knowledge that any of its potential witnesses has a prior criminal record or pending criminal case."

the defendant in their custody. Ms. Sanders identified him as the robber. Ms. Sanders also identified the defendant at a subsequent lineup and at trial.

On cross-examination, Ms. Sanders testified that she knew Lonnie Sartin, a desk clerk at the Irving Hotel. Ms. Sanders stated further that she had previously identified the defendant as robbing the Irving Hotel and Lonnie Sartin on September 1, 1974. Ms. Sanders also was aware that Lonnie Sartin had accused the defendant of robbing the hotel on August 28, 1974. Finally, Ms. Sanders denied any knowledge about alleged prostitution in the hotel.

Prior to the start of the second day of trial, the State was given leave to amend its list of witnesses to include the name of Billy Wright.

Defense counsel then informed the trial court that he was having a problem obtaining the criminal records of the State's witnesses.

"MR. GOLDBERG: Judge, I would also note that we still have the continuing problem now with Mr. Wright added of trying to get the criminal history of the people. I issued a subpoena yesterday with the new information I had about Mrs. Sanders. We would ask for a minute. We have had a chance to talk to Mrs. Johnson who is going to testify today. I have not been able to locate her myself. We would like another minute to get her social security number. We will issue another subpoena today on Mrs. Johnson's criminal history. We are going to have to ask Mr. Wright, we would like to be able to do the same thing with him.

MR. BEST: Certainly, Judge. I'll assist them in getting that information and I will assist them in getting the B of I if one exists. If it turns up that they do have a background I will do whatever I can to help make the people available should the defense see fit to want to recall them."

The State called as its next witness, Mattie Johnson. Before her substantive testimony was taken, the trial court, outside the presence of the jury, elicited from Ms. Johnson her social security number and birthdate. This information was obtained in order to facilitate the defense's effort to acquire Ms. Johnson's criminal record.

Ms. Johnson testified that on September 24, 1978, at approximately 1:45 a.m., she was on duty as a desk clerk at the Irving Hotel. Ms. Johnson stated that while she was sitting in the office writing, Ms. Sanders, the hotel maid, was standing nearby in the lobby. Ms. Johnson heard a man order Ms. Sanders to "open the lobby door." Ms. Johnson looked up and saw a man break the glass lobby door and enter the hotel. As Ms. Johnson grabbed the telephone to call police, Ms. Sanders ran into the office, closed the door and held it shut. When the intruder began pounding on the office door, Ms. Johnson ran over to help Ms. Sanders hold it shut.

The intruder eventually kicked the door open and entered the office.

He struck Ms. Johnson above the left eye and ordered her to lie face down on the floor. The intruder accompanied his order with the following warning: "[B]itch, if you move I am going to blow your damn brains out." He was carrying a sawed off shotgun.

Ms. Johnson testified that although the intruder initially asked "where's the money," he already knew where everything was in the office because without any response from her or Ms. Sanders the intruder went straight to the drawer where the money was kept. After pocketing the money, the intruder stated: "[B]itch, you know I am not playing. You know me. You know me and you know I am not kidding." He then walked out the office door. Ms. Johnson was never able to identify the man.

Ms. Johnson testified that she began working at the Irving Hotel on September 14, 1974. At the time of the September 28 armed robbery, Ms. Johnson did not know the hotel had been robbed on August 28 and September 1, 1974. She also was unaware the defendant was implicated in those robberies. Ms. Johnson testified that she first met Ms. Sanders while working at the hotel. She did not meet Lonnie Sartin until after the September 28 armed robbery.

During defense counsel's cross-examination of Ms. Johnson, a vague reference was made to alleged prostitution at the hotel:

"Mr. Goldberg: During the two weeks you worked there Mrs. Johnson, you worked from 12:00 to 8:00 a.m.?

A. To 8:00.

Q. Were there frequent people, were people coming in frequently checking in and out of the hotel?

A. Not every night."

The State called as its next witness, Billy Wright. Prior to the taking of his substantive testimony, the defense informed the trial court: (1) that it had exercised the opportunity to interview Wright; and (2) that it had solicited the State's Attorney's aid in attempting to obtain Wright's criminal record.

Wright testified that on September 28, 1974, at approximately 1:45 a.m., he was walking back to his room at the Irving Hotel. As he approached the front of the hotel lobby, he saw a man kicking the lobby door. Wright was questioned further on this point:

"Q. Now, what, if anything did you notice that was unusual about that man that was kicking the door?

A. Well, I tell you I didn't stay * * * there too long to find out.

Q. Why was that?

A. Well, looked like I seen the barrel. I just * * * took off. I said forget it.

Q. What was it that you saw the barrel to?"

A. I don't know. Looked like a shotgun, a rifle or something."

Wright was unable to identify the man.

On cross-examination, Wright admitted: (1) that he had consumed one-half pint of vodka before returning to the hotel that morning; and (2) that he did not know the precise date the incident occurred. Defense counsel questioned Wright on what again appears to be a vague reference to prostitution at the hotel:

"Q. You lived at the hotel for about five months [in 1974], is that correct?

A. About five or six months.

Q. During the time you lived there were there many couples coming in and out of that hotel when you would come in?

A. Well, there was some coming in and out, yes."

Defense counsel also asked Wright whether there were television sets in the hotel rooms when he first moved in. The State objected to this line of questioning. During a side-bar with the trial judge, defense counsel responded to the objection:

"MR. GOLDBERG: Judge, we have evidence that we would be introducing in the Defense part of the case that there were television sets being taken out of the hotel. That Mr. Sartin was part of an arrangement in taking the sets out that he had made a specific arrangement with our client to do that. That at least we have evidence that the first armed robbery was staged, contrived affair and was a result of the relationship between my client and Mr. Sartin.

I would indicate that if this witness were allowed to testify, he would corroborate the fact that when he first moved into the hotel there were TV sets in the rooms not chained to the hotel rooms. That as he progressed there were sets missing from the hotel and that the television sets had to be chained by the owner Mr. Irving to the rooms. It corroborates what we feel our evidence will show."

In sustaining the State's objection to this testimony, the trial court informed defense counsel that any arrangements the defendant and Lonnie Sartin may have had to steal television sets from the hotel or to rob the hotel on August 28, 1974, was irrelevant with regard to defendant's guilt in this case.

The State called as its next witness Police Officer Richard Reskey. Officer Reskey testified that on September 28, 1974, at approximately 1:50 a.m., he received a radio dispatch "of a man with a gun at the Irving Hotel." Upon arriving at the hotel, Officer Reskey noted that the glass partition in the lobby door was broken and the office door was kicked in. When he met Ms. Johnson and Ms. Sanders, they appeared shaken and upset. Although the officer observed a bruise on Ms. Johnson's face, he did not make a note

of that injury in his official report because Ms. Johnson had declined hospital treatment. Ms. Sanders told Officer Reskey that the male robber had been a tenant at the hotel "a month ago" and went by the names Donald Higgins and Donald Jackson. Officer Reskey returned to his squad car and began to patrol the neighborhood.

At approximately 5 a.m. that same morning, Officer Reskey noticed a man, later identified as the defendant, walking down 56th Street, one-half block from the Irving Hotel. The defendant appeared to be carrying something in his hand, although Officer Reskey could not make out what it was. The officer approached the defendant and asked him to identify himself. When defendant stated that his name was Donald Higgins, Officer Reskey placed him under arrest. Officer Reskey drove the defendant to the Irving Hotel, where Ms. Sanders identified him as the robber. Defendant was then transported to the Second District police station and booked.

On cross-examination, Officer Reskey testified that about $200 was taken in the hotel robbery together with Ms. Johnson's tan purse. Officer Reskey testified further that neither a tan purse nor a sawed off shotgun was found in defendant's possession at the time of his arrest.

After the State rested its case-in-chief, the defense informed the trial court that it was still waiting for the criminal records of, among others, Ms. Sanders, Billy Wright and Lonnie Sartin.[2] (The State had previously informed the defense that Ms. Johnson had no prior criminal record.) The State pointed out that it was cooperating with the defense in its attempt to obtain the criminal records of the State's witnesses.

> "[I]f we have knowledge of the fact that a person has a criminal conviction, we would state so. When we do not, (it is) because the only information we * * * ascertain from witnesses * * * (are) their name and address, we don't ask birthdates or social security numbers. Once in a while, by chance, we have it. All we can submit (therefore) is [a] name check. That is why we stated in the discovery that we had no knowledge. If we had we would say so * * *.
>
> Now, immediately prior to trial, when the Court ordered us * * * to furnish the (criminal record) information pursuant to each witness coming to testify. I stated at that time, * * * that I will assist the defense in asking whatever questions they have of the witness to obtain social security numbers or birthdates or whatever. I said that whenever they obtain that information and supply it to me, or I obtain it, we will immediately order the appropriate B. of I. background based on that information, and I have done that with regard to each witness."

---

[2] The defense had also asked for the criminal records of James and Quincy Irving. However, the record discloses that James and Quincy Irving were not listed in the State's discovery answer as potential witnesses.

After considering the positions of the parties, the trial court replied:

"Let me say that, gentlemen, I have indicated that I would direct the State to supply the B. of I. sheets if they were available. I would ask that on those parties of whom we are speaking in this case, that they do so. I would notify defense counsel from this point forward, on all cases, I will direct, if they wish a name check by the State, if the defense wishes anything further, it would be their responsibility and obligation to get the social security number, date of birth and any other numbers that might facilitate getting correct B. of I. sheets. If they fail to do so all they would have then, as far as this court is concerned, is a name check ordered by the State.

We can avoid this problem that way."

Before the defense put on its case-in-chief, the State presented a motion *in limine*. The motion requested that the trial court prohibit the defense from introducing:

(1) evidence of alleged prostitution at the Irving Hotel; the State reasoned that such evidence was irrelevant;

(2) evidence of alleged arrangements between defendant and Lonnie Sartin; the State argued that since Lonnie Sartin was neither a victim nor a witness to the particular crime charged, evidence of such arrangements was irrelevant and would merely serve to confuse the jury; and

(3) testimony from Larry Thompson concerning certain alleged hearsay statements made by defendant and Lonnie Sartin; the State again arguing that such evidence was irrelevant.

The defense responded to the prosecution's motion *in limine* by stating:

"[T]he defendant is introducing a defense of alibi to prove where he was. But secondly, the defendant is trying to impeach the credibility of Mrs. Sanders.

I think it is a proper defense to introduce evidence of why Mrs. Sanders would not be telling the truth."

The trial court asked for an offer of proof as to precisely what defense counsel intended to prove "outside of the alibi." The offer of proof tendered by defense counsel was somewhat confusing and disconnected. Upon careful examination the offer of proof appears to contain the following:

(1) Denise Jackson, defendant's girlfriend, would testify that she had sex with Lonnie Sartin two or three times for money;

(2) Denise Jackson would testify further that Lonnie Sartin accused the defendant of the August 28, 1974, robbery at the Irving Hotel; yet Sartin personally checked defendant and Ms. Jackson out of the hotel August 30;

(3) Denise Jackson would also testify that the Irving Hotel was used for prostitution;

(4) Defendant would testify that Lonnie Sartin was stealing TV sets from the hotel and that defendant himself was acting as a "fence" to sell the stolen TV sets;

(5) Defendant would testify that Lonnie Sartin claimed Denise Jackson stole money from him; that defendant suggested Sartin fake a robbery of the hotel employees: (i) to recoup the money taken by Denise Jackson; and (ii) to cover up "the money that's been taken out of the till."

After considering the offer of proof, the trial court stated:

"I would respectfully grant [the State's] motion *in limine* to prohibit you from going into any alleged conspiracy or any misconduct on the part of Mr. Sarton (sic) as having no materiality or relevance to the primary witness in this case, Gussie Sanders."

The trial court reserved its ruling on whether the defense would be allowed to introduce evidence concerning the August 28, 1974, and September 1, 1974, armed robberies at the Irving Hotel.[3]

The defense called as its first witness Ruby Gay, the defendant's aunt. Ms. Gay testified that on September 27, 1974, at approximately 11:30 p.m., she arrived at Jenny's Lounge at 840 West 69th Street. Ms. Gay testified defendant entered the lounge around 12 a.m. accompanied by Larry Adams and another man she did not know. Ms. Gay left Jenny's Lounge at 2 a.m. To the best of her knowledge the defendant did not leave the lounge prior to that time.

On cross-examination, Ms. Gay testified that after defendant's mother passed away, he lived in her home for awhile. Ms. Gay stated that since defendant moved out of her home, he had visited her every weekend. Ms. Gay testified further that while she was able to recall the specific hours she first and last saw defendant on September 27 and 28, 1974, she could not recall any specific hours she saw defendant on other weekends in 1974.

Larry Adams, a friend of defendant's for 14 years, testified that on September 27, 1974, at about 10 p.m. defendant arrived at his house at 5759 South Michigan Avenue. At approximately 10:15 p.m., Adams and the defendant walked to 55th and Indiana and bought some wine at a liquor store. They had a drink in the alley before entering a nearby pool room. Upon leaving the pool room, the two men walked to the accused's aunt's house at 55th and Morgan to look for defendant's cousin. After leaving there, Adams and the defendant walked to a liquor store located on 59th Street and "had another little taste." They then took a bus to 69th Street

---

[3] As noted previously, defendant was charged in this case with the September 28, 1974, armed robbery at the Irving Hotel.

where they entered Jenny's Lounge sometime between 12 and 1 a.m. In the lounge were defendant's brother, aunt and cousin.

Adams testified that he left the lounge at 4 a.m. with defendant, Larry Thompson and some of defendant's other friends. Adams stated that he never saw defendant leave the lounge before 4 a.m. Adams, Thompson and the defendant took a cab to 55th and Indiana to see if a tavern located there was open. It was not. They then walked down 56th Street toward Prairie Avenue with the intention of finding and purchasing some "reefers." While they were standing in the middle of 56th Street somewhere between Indiana and Prairie, defendant left Adams and Thompson and was gone 15-20 minutes. As Adams observed the defendant walking back towards the group, he saw the police pull up and confront defendant at the intersection of 56th and Prairie. The police placed defendant in the back seat of a squad car and drove down Prairie Avenue to the Irving Hotel. Adams testified that he saw the police take defendant into the hotel.

On cross-examination, Adams testified that he did nothing immediately following this incident. It was not until later that same day that Adams got in touch with defendant's brother and informed him of the arrest. The prosecution questioned Adams further:

"Q. Do you know this Larry Thompson?

A. I met him that night.

Q. By the way, do you know where Larry Thompson is today?

A. I imagine he's in jail."

Denise Jackson testified that she lived with defendant at the Irving Hotel from late July until August, 30, 1974. Ms. Jackson also testified that they were checked in and out of the hotel by Lonnie Sartin, a desk clerk. The State objected when defense counsel attempted to question Ms. Jackson about whether she knew an Irving Hotel employee was robbed on August 28, 1974, and that Lonnie Sartin had identified the defendant at that time as the robber. The trial court sustained the State's objection.

Dwight Higgins, defendant's brother, testified that on September 28, 1974, he arrived at Jenny's Lounge sometime between 12 and 1 a.m. Upon entering the lounge he saw defendant, Larry Adams and Valerie Gay, defendant's cousin. Higgins testified that he left the lounge at 4 a.m. As he was leaving, Higgins observed defendant, Larry Adams and Valerie Gay starting to enter a cab with Larry Thompson standing nearby.

Defendant testified that he was with Larry Adams the night of September 27, 1974, from 9 p.m. until 12 a.m. At approximately 12:15 a.m. the morning of September 28, defendant and Adams entered Jenny's Lounge where defendant saw his brother, aunt and cousin, as well as a few other friends. Defendant testified that when he, Adams and Larry Thompson left the lounge at 3:30 a.m. they went to 55th and Indiana to check on a pool room and liquor store, both of which were closed. As

they were walking down 56th Street, the police pulled up and placed defendant under arrest.

Defendant stated that he and Denise Jackson lived at the Irving Hotel from "the last part of July" until August 30, 1974. Lonnie Sartin was the desk clerk who checked them in and out of the hotel. When defense counsel attempted to ask defendant whether Lonnie Sartin had accused him of two previous robberies at the Irving Hotel, the State objected. Following a side-bar, the trial court sustained the State's objection:

"[W]e are talking about Lonnie Sartin, who, while he was involved with two other [robberies] involving the same defendant and the same hotel, he in not involved in this one. And there has again been no showing by the defense concerning this Lonnie Sartin having any agreements or working relationship or anything else with either of the two people [Ms. Johnson and Ms. Sanders] who have testified [against the defendant] in this case."

Defendant went on to testify that when arrested he had about $50 in his wallet, $30 of which he had borrowed from his brother the day before.

On cross-examination, defendant testified that he went by the names, Donald Higgins and Donald Jackson. Defendant was then questioned as follows:

"Q. By the way, the Larry Thompson that you referred to, where is he?

A. Where is he?

Q. Yes.

A. He's in jail."

On redirect examination, defense counsel attempted to expound on this point:

"Q. Larry Thompson is in jail with you right now, isn't he Donald?

A. Yes.

Q. And Larry Thompson was arrested the very same night you were arrested. Is that right, Donald?

A. Yes.

Q. And Larry Thompson was arrested when he came down to —

Mr. Best: Objection, Judge.

Mr. Goldberg: I think the door is open Judge."

The trial court sustained the State's objection finding the circumstances of Thompson's arrest irrelevant to this case.

At the close of defendant's testimony, defense counsel made an offer of proof "as to what [the defendant] would have testified [to] had he been allowed to testify about what * * * occurred at the Irving Hotel."

"Donald Higgins would have testified that he moved into the Irving Hotel some time in late July or August, 1974; that when he moved in, within a couple of days after he moved in, he had a

conversation with the desk clerk, a man by the name of Lonny Sarton [sic]; that this conversation was in the hotel and Donald Higgins and Lonny Sarton [sic] were the only people present at the time of that conversation; that during that conversation, Lonny Sarton [sic] indicated to Donald Higgins that he'd like to have some female companionship, that he was interested in Donald Higgins' girlfriend, Denise Jackson; that terminated their first conversation; that shortly thereafter they had a second conversation some time during the first week or so in August; at that time Lonny Sarton [sic] indicated that Denise Jackson had taken $94 from him, and also, Lonny Sarton [sic] indicated that he wanted Donald Jackson to sell a television set that belonged to the hotel; that at that time, during that conversation, Donald Jackson said — I mean Donald Higgins said, "I don't know anything about the $94, and that terminated that conversation; that shortly thereafter there was another conversation in the hotel between Donald Higgins and Lonny Sarton [sic]; at that time Lonny Sarton [sic] again reiterated he wanted the $94 that Denise Jackson had taken from him; at that time Donald Higgins indicated to him, made a suggestion, "Why don't you take the money out of the hotel, why don't you take the money out of the hotel." and Lonny Sarton [sic] did not reply, or was part of that conversation but didn't say anything specific at that point; also, at that time Lonny Sarton [sic] gave Donald Jackson the first television set out of that hotel, he gave it to Donald Higgins to sell that television set, and Donald Higgins proceeded to take the television set, sell it for an amount of money, sold that television for $80 and kept $20 for himself, gave $60 to Mr. Sarton [sic]; that shortly thereafter there was another conversation between Donald Higgins, another day, during the first few weeks in August, with Lonny Sarton [sic], where again Lonny Sarton [sic] asked him for the $94 back that he felt Denise had taken from him; that at that time Donald Jackson made the same suggestion about taking the money from the hotel, and then faking a robbery; that a period of time passed, and on August 27th, 1974; at that time a second television set, plus some bed linen belonging to the Irving Hotel was given to Donald Higgins to sell for Lonny Sarton [sic], which he sold, which gave most of the money he received, monies of $120, kept $30 and gave $90 to Lonny Sarton [sic]; that on August 28th, 1974, Donald Higgins would testify that he was in his hotel room, that he came out of it, looked over the bannister from the third floor and saw police in the lobby of the hotel; that he went back to his room and the next day spoke with someone in the hotel who indicated that there had been a robbery in the hotel of Lonny Sarton [sic] the

night before, and on the 30th of August, Donald Higgins checked out of the hotel and Lonny Sarton [*sic*] was the desk clerk at the time he checked out of the hotel; that he moved into a hotel called the Crilly Hotel [phonetically] within a few blocks from the Irving Hotel; that on September—late September, 1974, he had a conversation with Lonny Sarton [*sic*]; that at that time a conversation took place in a tavern; that at that time Lonny Sarton [*sic*] either indicated that he had told the police Donald Jackson was involved in a robbery, even though Donald Jackson was not aware that he was charged—or that Lonny Sarton [*sic*] had reported him to the police—that's on September * * *."

Defense counsel again brought up what he termed his "continuing request" for the criminal records of the State's witnesses. The State informed the trial court: (1) that Mattie Johnson had no criminal record; (2) that the information on Gussie Sanders was already furnished to defense counsel; and (3) that the only information obtained with regard to the witness Billy Wright was a criminal record sheet on a person named Theatrice White, Jr.

During rebuttal, the State introduced evidence that on June 15, 1971, the defendant pled guilty to a robbery offense. During surrebuttal, the defense introduced a certified conviction statement reflecting that Billy Wright entered a guilty plea on February 21, 1973, to a charge of theft.

Following presentation of all the evidence and after having heard closing arguments, the jury deliberated and found the defendant guilty of armed robbery and aggravated battery. The trial court sentenced defendant to a term of 7 to 21 years for armed robbery and to a term of 2 to 6 years for aggravated battery, the sentences to run concurrently. Defendant appeals.

OPINION

I

Defendant initially contends the trial court committed prejudicial error in refusing to consolidate the three indictments for a single jury trial. We disagree.

Defendant presented only one reason to the trial court in support of his motion for consolidation. Defendant asserted that he had a similar defense to all three indictments. Yet by choosing *not* to reveal the nature of that alleged defense, defendant relegated the trial court to the face of the three indictments in ruling on the motion for consolidation.

■■ A trial court may order two or more separately charged offenses to be tried together if the offenses are: (a) based on the same act; or (b) based on two or more acts which are part of the same comprehensive transaction. (Ill. Rev. Stat. 1977, ch. 38, pars. 114—7, 111—4(a).) Joinder

will not be permitted, however, if the offenses are unrelated, if the crimes occur several days apart, or if there is no concerted plan of action or scheme linking the two or more felonious acts. (See *People v. Hyche* (1978), 63 Ill. App. 3d 575, 380 N.E.2d 373; *People v. Daniels* (1976), 35 Ill. App. 3d 791, 342 N.E.2d 809.) Whether separately charged offenses should be consolidated for a single jury trial rests within the sound judicial discretion of the trial court. *People v. Carmack* (1977), 50 Ill. App. 3d 983, 366 N.E.2d 103.

Defendant claims the trial court erred in refusing to exercise its discretion in this case. In ruling on defendant's motion for consolidation, the trial court stated:

"I have no right to tell the State how to try the case, whether it must be consolidated evidence."

We agree that this statement demonstrates the trial court mistakingly believed it did not have discretionary authority, upon a defendant's request, to consolidate separately charged offenses for a single jury trial.[4] We are also aware that " '[t]here is error when a trial court refuses to exercise discretion in the erroneous belief that it has no discretion ° ° °.' " (*People v. Autman* (1974), 58 Ill. 2d 171, 176, 317 N.E.2d 570, 572, quoting *People v. Queen* (1974), 56 Ill. 2d 560, 565, 310 N.E.2d 166, 169; see *People v. Perry* (1975), 27 Ill. App. 3d 565, 327 N.E.2d 259.) Nevertheless, we do not believe the error committed here warrants reversal.

■■ The three indictments charge defendant with three separate and independent felonious acts of armed robbery. The only thing in common among the three offenses is that they each took place at the Irving Hotel. In contrast to that single similarity, there are numerous factual differences:

(1) the three armed robberies occurred on different dates;

(2) they involved different victims;

(3) there were eyewitnesses to two of the armed robberies but not to the third;

(4) defendant was aided by an alleged accomplice in two of the armed robberies but not in the third; and

(5) defendant was charged with aggravated battery in connection with only one of the armed robberies.

There is no thread of continuity between the three offenses and absolutely no indication that they were part of the same comprehensive transaction. (*Cf. People v. Bricker* (1974), 23 Ill. App. 3d 394, 319 N.E.2d 255.) Furthermore, considering their wide factual differences, it would

---

[4] This conclusion is supported by a subsequent statement in which the trial court alluded to its earlier denial of defendant's motion for consolidation:

"[T]he Court ° ° ° simply said [it] had no jurisdiction or authority to direct the State how to try their cases, they can try them one at a time or they can consolidate them."

have unduly confused the jury had the trial court consolidated these three separate indictments for a single jury trial. See Ill. Rev. Stat. 1977, ch. 38, par. 114—8.

We find that the trial court's decision denying defendant's motion for consolidation was the "only" proper conclusion that could have been reached in this case. Consequently, while the trial court did err in the reason it assigned for its decision, this error was harmless and does not require reversal of defendant's conviction. See *People v. Gardner* (1977), 56 Ill. App. 3d 606, 371 N.E.2d 1164.

## II

Defendant next contends that the trial court erred in restricting defense counsel's examination of Billy Wright, Denise Jackson and the defendant, himself. We disagree.

During cross-examination, defense counsel asked Billy Wright whether there were television sets in the rooms of the Irving Hotel when he moved in. The State objected to this line of questioning. Defense counsel responded to the objection in a side-bar with the trial judge:

> "MR. GOLDBERG: Judge, we have evidence that we would be introducing in the Defense part of the case that there were television sets being taken out of the hotel. That Mr. Sartin was part of an arrangement in taking the sets out that he had made a specific arrangement with our client to do that. That at least we have evidence that the first armed robbery was stated, contrived affair and was a result of the relationship between my client and Mr. Sartin.
>
> I would indicate that if this witness were allowed to testify, he would corroborate the fact that when he first moved into the hotel there were TV sets in the rooms not chained to the hotel rooms. That as he progressed there were sets missing from the hotel and that the television sets had to be chained by the owner Mr. Irving to the rooms. It corroborates that we feel our evidence will show."

The trial court sustained the State's objection on the basis that the above evidence was irrelevant. We agree.

■■ Defendant and Lonnie Sartin's alleged arrangement to steal television sets from the hotel had no relevance with regard to whether defendant committed the robbery at the hotel on September 28, 1974. Defense counsel's statement, that "we have evidence * * * the [August 1, 1974] armed robbery was staged, contrived affair and was a result of the relationship between [defendant] and Mr. Sartin," was inherently ambiguous and confusing. It failed to demonstrate any connection between the stolen television sets and defendant's guilt or innocence with

regard to the September 28 armed robbery. Consequently, the evidence was properly excluded as irrelevant.

The trial court also precluded defense counsel, on his case-in-chief, from examining Denise Jackson and the defendant with regard to:

(1) alleged prostitution at the Irving Hotel;

(2) alleged arrangements between defendant and Lonnie Sartin to steal television sets from the hotel;

(3) Denise Jackson and Lonnie Sartin's sexual relationship; and

(4) the circumstances surrounding two prior robberies of the employees at the Irving Hotel.

Defendant claims the exclusion of this evidence was error. We disagree.

The record fails to disclose clearly and precisely, what theory of defense defendant was attempting to set up by the introduction of this evidence. The offers of proof presented to the trial court were confusing and ambiguous. They contained numerous facts and circumstances which were disconnected and disassociated. Since the defendant failed to structure the above evidence into a coherent theory of defense, the evidence was properly excluded.

## III

Defendant contends he was prejudiced by the State's failure to produce, before trial, the criminal records of Mattie Johnson, Gussie Sanders and Billy Wright.

Supreme Court Rule 412(a)(vi) (Ill. Rev. Stat. 1977, ch. 110A, par. 412(a)(vi)) provides:

"(a) * * * [T]he State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

* * *

(vi) any record of prior criminal convictions, which may be used for impeachment, of persons whom the State intends to call as witnesses at * * * trial."

This disclosure requirement must be considered in conjunction with subparagraph (g) of Supreme Court Rule 412:

"(g) *Upon defense counsel's request and designation of material or information which would be discoverable if in the possession or control of the State, and which is in the possession or control of other governmental personnel, the State shall use diligent good faith efforts to cause such material to be made available to defense counsel*; and if the State's efforts are unsuccessful and such material or other governmental personnel are subject to the jurisdiction of the court, the court shall issue suitable subpoenas or orders to cause such material to be made available to defense counsel." (Emphasis added.) Ill. Rev. Stat. 1977, ch. 110A, par. 412(g).

■ In our view, the plain import of Supreme Court Rule 412 imposes an affirmative obligation upon the State to obtain the criminal histories of its potential witnesses and to disclose to defense counsel, upon request, any record of prior criminal convictions which may be used for impeachment purposes at trial. We cannot agree with the able trial judge's suggestion that before such a records check will be made by the State, the onus is upon defense counsel to acquire, *from the State's own witnesses*, such necessary information as birthdates and social security numbers. In view of the State's superior access to this information and the unequivocal language of Supreme Court Rule 412, there is no reason for imposing this burden upon the defense.

■ Although we do not condone the discovery procedure followed in this case, it does not warrant the reversal of defendant's conviction. There has been no showing that defendant was prejudiced by the procedure that was followed. (See *People v. Green* (1976), 42 Ill. App. 3d 978, 356 N.E.2d 947.) The record reveals that at various points during the trial, a check was made by the State on the criminal records of Mattie Johnson, Gussie Sanders and Billy Wright. It was verified that Mattie Johnson did not have a criminal record. The information concerning whatever criminal record Gussie Sanders may have had was furnished to defense counsel. The record check made on Billy Wright disclosed that a man by the name of Theatrice Wright, Jr., with the same birthdate as Billy Wright, had a conviction for theft. After extended discussion and further investigation, defense counsel was allowed to present the theft conviction to the jury for the purpose of impeaching Billy Wright. In light of the above circumstances and the persuasive evidence of defendant's guilt in this case, the error committed in the discovery procedure was harmless and does not require the reversal of defendant's conviction.

## IV

■ Defendant contends he was prejudiced when the State elicited from him on cross-examination the fact that Larry Thompson, a potential defense witness, was in jail at the time of trial. By failing to raise a proper and timely objection to this line of questioning, defendant waived any error for purposes of appeal. *People v. Adams* (1968), 41 Ill. 2d 98, 242 N.E.2d 167.

Defendant argues further that the trial court erred when it precluded defense counsel, on redirect examination, from exploring the circumstances of Thompson's arrest. Defendant reasons that by introducing admittedly irrelevant testimony (namely, that Larry Thompson was in jail at the time of defendant's trial), the State "opened the door" to further irrelevant evidence concerning the circumstances surrounding Thompson's arrest. In short, defendant invokes the doctrine of curative admissibility.

In Illinois, there are cases supporting three separate and distinct theories on curative admissibility.

"The first [theory] * * * is that '[a]dmission of an inadmissible fact, without objection by the opponent, does not justify the opponent in rebutting by other inadmissible facts.' (*Wickenkamp v. Wickenkamp,* 77 Ill. 92; *Maxwell v. Durkin,* 185 Ill. 546; *People v. Newman,* 261 Ill. 11; *Levinson v. Fidelity and Casualty Co. of New York,* 348 Ill. 495.) Another concept of the doctrine allows the opponent to resort to similar inadmissible evidence. (*Jones v. Sanitary District of Chicago,* 265 Ill. 98; *Bogart v. Brazee,* 331 Ill. 160.) The third theory on curative admissibility is that an opponent may reply with similar evidence if it is needed to eradicate an unfair prejudice which might ensue from the original evidence. (*Chicago City Ry. Co. v. Bundy,* 210 Ill. 39; *Mash v. People,* 220 Ill. 86.)" *People v. Wilbert* (1973), 15 Ill. App. 3d 974, 984-85, 305 N.E.2d 173, 179-80.

In accordance with the majority of Illinois courts (see, *e.g., People v. Lewis* (1977), 52 Ill. App. 3d 477, 367 N.E.2d 710; *Saputo v. Fatla* (1975), 25 Ill. App. 3d 775, 324 N.E.2d 34; *People v. Wilbert* (1973), 15 Ill. App. 3d 974, 305 N.E.2d 173), we find the third theory to be the better reasoned approach.

■■ The doctrine of curative admissibility, under this approach, is not intended to operate as a panacea for parties who fail to raise proper and timely objections to what should have been inadmissible evidence. It does not permit a party to introduce irrelevant evidence, merely because his opponent brought out some evidence on the same subject. (*Saputo v. Fatla* (1975), 25 Ill. App. 3d 775, 324 N.E.2d 34.) Rather, the doctrine of curative admissibility is limited in scope and design to those situations where its invocation is deemed necessary to eradicate *undue* prejudicial inferences which might otherwise ensue from the introduction of the original evidence. The decision of whether to admit curative evidence lies within the sound judicial discretion of the trial judge. "He should weigh the probable influence of the first evidence, the time and distraction incident to answering it, and the possibility and effectiveness of an instruction to the jury to disregard it." McCormick on Evidence §57, at 133 (Cleary 2d ed. 1972).

In this case, the State introduced, without objection by defendant, evidence that Larry Thompson was in jail at the time of defendant's trial. This evidence admittedly was irrelevant. Defendant claims the trial court erred when, on the basis of the State's timely objection, it denied him the opportunity to explain "that Thompson was arrested when he went to the police station to see why defendant was under arrest."

■■ Even if the fact that Thompson was incarcerated at the time of trial

could be construed as prejudicial to defendant, we fail to understand how the above circumstances surrounding Thompson's arrest would have served to alleviate that prejudice. Consequently, we believe the trial court properly excluded this evidence as irrelevant.

## V

■■ Finally, defendant contends he could not be convicted for both aggravated battery and armed robbery. We disagree.

In *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844-45, our supreme court set forth the general rule with regard to multiple convictions and concurrent sentences:

> "Multiple convictions and concurrent sentences should be permitted in * * * cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold * * * that *when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered.*" (Emphasis added.)

Applying this test to the facts before us, we find that defendant was properly convicted for both aggravated battery and armed robbery. *People v. Olmos* (1978), 67 Ill. App. 3d 281, 384 N.E.2d 853; *People v. Blakely* (1977), 50 Ill. App. 3d 536, 365 N.E.2d 996; *People v. Davies* (1977), 50 Ill. App. 3d 506, 365 N.E.2d 628.

Accordingly, for the reasons stated, we affirm the convictions and concurrent sentences of the defendant.

Affirmed.

JOHNSON and ROMITI, JJ., concur.