THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL CHAMBERS, Defendant-Appellant.

Second District   No. 2—86—0671

Opinion filed February 2, 1989.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Charles M. Schiedel and Peter L. Rotskoff, both of State Appellate Defender's Office, of Springfield, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LINDBERG delivered the opinion of the court:

Defendant, Michael Chambers, was charged with residential burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—3(a)) in an information filed in the circuit court of Winnebago County. A jury found him guilty of that offense. He was subsequently sentenced to a 10-year term of imprisonment. Defendant has appealed this conviction of residential burglary.

Defendant raises four issues on appeal. Defendant contends that he should be granted a new trial because: (1) the trial court erred in admitting testimony that (a) defendant, "while *** in custody awaiting trial, *** threatened to harm the children of Sheila Stivers, the State's primary witness," and (b) the police obtained a warrant for defendant's arrest; (2) the trial court erred in allowing the State, on redirect examination of Stivers, to elicit testimony about (a) defendant's "alleged heroin use" and (b) "allegations that before [defendant] was arrested, he threatened to kill Stivers and her children"; (3) the trial court erred in admitting "hearsay evidence which improperly bolstered the credibility of *** Sheila Stivers"; and (4) defendant was prejudiced by the cumulative effect of improper remarks made by the prosecutor during the State's closing arguments.

Richard Bowers and his wife returned from their honeymoon on September 30, 1985. At about 6 p.m. on October 2, 1985, they left their Rockford home to go to a friend's house for dinner. All of the doors to the Bowers' house were locked. They returned at about 11:30 p.m. At that time, the basement door was open. Upstairs, they found that the brown-striped tan pillowcases had been removed from their king-size bed. There were many wedding gifts in the house, most from Weise's, where Bowers' wife had registered. These included silver trays and salt and pepper shakers. About $1,000 worth of the gifts were missing. They went downstairs, where they noticed that the back door had been pried open. Bowers had a collection of Mickey Mouse watches, dating from the mid-1930s to August of 1985, that he kept in the china cabinet. This collection, valued at $3,000 to $5,000, was gone.

Sheila Stivers contacted Detective Stephen Benny by telephone on October 29, 1985. On October 30, 1985, Stivers gave Benny two of the Mickey Mouse watches belonging to Bowers. That afternoon, Stivers gave Detectives Benny and Gray a statement implicating defendant and Monte McCoy in the October 2 burglary. Benny and Gray went to the county jail, where McCoy was being held, and found a Mickey Mouse watch and two Australian coins, which had been taken from Bowers' home, among the property the jail was holding for McCoy. At about 7:30 p.m. Benny and Gray went to a trailer in

which McCoy and defendant had been living. Defendant, John Carr, and one or two other people were in the trailer. The detectives found two champagne buckets in the kitchen and several Mickey Mouse watches in the living room, all of which belonged to Bowers.

Benny and Gray, on November 1, 1985, received another of Bowers' Mickey Mouse watches from Dale Harwick. Harwick testified that he had paid defendant, who said the watch was "hot," $10 for it. A stolen television, not taken in the Bowers burglary, was found in Harwick's home. Harwick said that he bought it from McCoy, but that he had not known it was stolen. When he talked to the police, Harwick had been afraid he might be charged with burglary in regard to the stolen television.

Sheila Stivers testified that on October 3 at around 8:15 a.m. she went to the trailer in which defendant and McCoy lived. Defendant was in his bedroom, and McCoy and Tina James were in the living room. Stivers was sitting on the bed talking to defendant "about the stuff that they had stolen the night before." Defendant was telling her "the things they had taken out of the house that they had broken into." When she went into the living room she saw some watches, and defendant had told her they had gotten a silver tray and some brass buckets.

While Stivers and defendant were in the bedroom talking, McCoy yelled out, "Hey, Mike, you know whose house we hit last night?" Defendant responded, "No. Whose?" Defendant and Stivers went into the living room, where McCoy and James were reading a sales receipt from one of the watch cases that had the name Richard J. Bowers on it. Defendant said, "Oh, fuck, man, it don't matter anyways. That dude is rich."

Defendant opened the oven door and pulled out a silver tea service. There was a wooden wheel with jewelry on it. Defendant opened the cupboards and pulled out two brass champagne coolers, taken from Bowers' residence. In response to questions from defendant, Stivers told him that she did not know what they were and did not know what they were worth.

Later on October 3, Stivers, defendant, and McCoy went to Weise's Department Store. Stivers took two serving dishes and a pair of salt and pepper shakers inside. Stivers used a false name to return the items for a cash refund, which she gave to defendant. At a later date, defendant and Stivers went to the Broadway Book and Stamp Store with three watches to sell. The clerk there bought one of the watches. The other two watches were the ones Stivers later gave to Detective Benny.

Defense counsel cross-examined Stivers about her testimony's inclusion of information she had not told the police on October 30. She had not told the police about defendant's statement, "Oh, fuck, man, it don't matter anyways. That dude is rich." Nor had she told the police about defendant's asking her about the value of the champagne coolers. She also testified:

"Q. [Defense counsel]: Were you scared that you might get charged with something on October 30?

A. Yes, I was.

Q. You did not want to be deprived of your children certainly, did you?

A. No. I was scared of a lot of things when I was down here on October 30. Mike [defendant] had threatened my children's life. I was just plain scared. I wanted him as far away from me as I could get him. I was scared to death."

On redirect examination, the State questioned Stivers about her delay in telling the police what she knew about the Bowers burglary.

"Q. [Prosecutor]: You learned of the Bowers' burglary on the 3rd of October, correct?

A. Yes.

Q. What is the reason you did not tell the police on the 3rd of October about the Bowers' burglary?

A. At the time I just didn't. I had no reason. I just didn't.

Q. When did you get a reason.

A. The 19th of October; Mike had come to my house. We had sold some stuff to some people. I was supposed to go back and get the money. That day *** my kids' father had died, and Mike came back to my house.

* * *

October 19 my kids' father had died. That night I came home, and that day I was supposed to go back to pick up the money. Since he had died I couldn't go back and get the money, so Mike came over to my house. He was mad. He said—called me a stupid bitch, told me if I fucked him over, he would fuck my kids up and fuck me up, too. He said he would burn my fucking house down with me and my kids in it if I didn't get him that money. The next day I went and I got the money, and I brought it back to him.

Q. After that did you approach the police?

A. Yes, I did.

Q. And your reason was to get back to him for what he said?

A. No. It was because I was scared. I went over to Mike's house the 29th of October. Him and John Carr was in the living room ***.

* * *

Q. Exactly what was it they were doing which frightened you?

A. Shooting heroin.

Q. What do you mean by that?

A. Taking a needle and shooting it into their veins."

Stivers knew it was heroin, although she had never used it. She was a recovering alcoholic and a recovering drug addict. As of May 5, 1986, she would have been dry for five months. She had last shot up cocaine on October 19, 1985, and before that had not shot any cocaine since September 28. Stivers testified that the facts of October 3 had become more clear than they had been to her on October 30 because not using drugs or alcohol had "defogged" her mind.

Stivers also during redirect examination (which occurred at the April 29, 1986, trial) testified:

"Q. [Prosecutor]: *** [H]as there been anything else *** that has frightened you?

A. Yes, there has.

Q. What, please?

* * *

A. It was probably three months ago. I can't tell you the date. I was at an A.A. meeting, and a friend of mine, her name is Lisa Rixie, she came up to me and she—

MR. KING [Defense counsel]: (Interrupting) Judge, I object to any conversation between this witness and anybody else.

THE COURT: Objection sustained.

MR. GEMIGNANI [Prosecutor]: Judge, I want to say—I will not say it in front of the jury.

THE COURT: You are offering it for what was said, not for the truth of what was said, but it was said.

MR. GEMIGNANI: That is correct.

THE COURT: Overruled; you may answer.

A. Lisa Rixie came up to me on a Sunday morning. She said, 'I have a message for you.' I said, 'Well, what is it?'

MR. KING: Judge, I object.

THE COURT: Overruled.

A. I said, 'What is it?' She said, 'Do you know Mike Chambers?' I said, 'Yeah.' I said, 'How do you know him?' And Lisa goes, 'He's in jail with my brother, Jamie.' And I don't know

Jamie Rixie. I have never met Jamie Rixie. But through Lisa, through A.A. meetings, I know he's in jail for murder. She goes, 'My brother called me and told me to tell you if you showed up at this trial, that something bad, really bad, was going to happen to your kids.'

THE COURT: You are offering that not for the truth of what was said *** to Mrs. Stivers but that this was said, is that correct?

MR. GEMIGNANI: That is correct.

THE COURT: The jury is admonished to consider it only for that purpose.

Yes?

MR. KING: Judge, I object to that. I think it is totally irrelevant. I think that the admonishment of the jury is of little or no consequence or effect. I would ask for a mistrial at this time.

THE COURT: Overruled—denied.

Q. [Prosecutor]: Who was it that ostensibly told Rixie that?

A. Jamie Rixie told his sister, Lisa, that.

Q. Who told Rixie?

A. Mike Chambers.

MR. KING: Judge, I object. She does not have any idea what was going on anyplace other than this testimony.

THE COURT: Objection overruled."

Detective Gray testified that Stivers never contacted him about the threats defendant allegedly made from jail, which Stivers learned of from Lisa Rixie.

In his first issue, defendant argues that the trial court erred in permitting (1) Sheila Stivers to testify on redirect examination about a conversation with Lisa Rixie regarding threats against Stivers defendant allegedly communicated while in jail to Lisa's brother, Jamie, and (2) Detective Benny to testify that he obtained an arrest warrant for defendant after he talked with Stivers. In his second issue, defendant argues that the trial court erred in permitting Stivers to testify on redirect examination about (1) threats made by defendant, against Stivers and her children, prior to defendant's arrest and (2) her seeing defendant use heroin. With the exception of the testimony regarding the issuance of the arrest warrant, which will be discussed separately, the contentions made in the first two issues concern the State's redirect examination of Stivers. We will discuss the alleged errors during redirect examination of Stivers in the order in which they occurred.

The first was Stivers' testimony that defendant threatened Stivers and her children prior to his arrest and the second was her testimony that she saw defendant use heroin. Defendant contends that this testimony suggesting his commission of other crimes, although relevant to an issue he had raised on cross-examination of Stivers, had a probative value which was outweighed by its prejudicial effect. (*People v. Rodriguez* (1982), 107 Ill. App. 3d 43, 437 N.E.2d 441.) We disagree.

One of the points on which defendant cross-examined Stivers was the question of why she did not go to the police until October 29 when she testified she had known about defendant's involvement in the offense at bar as early as October 3. To this end, defense counsel elicited the following testimony:

"Q. [Defense counsel]: Were you scared that you might get charged with something on October 30?

A. Yes, I was.

Q. You did not want to be deprived of your children, certainly, did you?

A. No. I was scared of a lot of things when I was down here on October 30. Mike [defendant] had threatened my children's life. I was just plain scared. I wanted him as far away from me as I could get him. I was scared to death."

The implication in defense counsel's questions and Stivers' answers was that she was afraid of things the authorities might do to her (*i.e.*, charge her with a crime or take her children away) and so went to the police to make a deal. She also volunteered that defendant had threatened her children's lives and made it clear that she also feared him.

In response to this testimony, the State elicited the following testimony from Stivers on redirect examination:

"Q. [Prosecutor]: What is the reason you did not tell the police on the 3rd of October about the Bowers' burglary?

A. At the time I just didn't. I had no reason. I just didn't.

Q. When did you get a reason?

A. The 19th of October; Mike had come to my house. We had sold some stuff to some people. I was supposed to go back and get the money. That day *** my kids' father had died, and Mike came back to my house.

\* \* \*

October 19 my kids' father had died. That night I came home, and that day I was supposed to go back to pick up the money. Since he had died I couldn't go back and get the money, so Mike came over to my house. He was mad. He said—called

me a stupid bitch, told me if I fucked him over, he would fuck my kids and fuck me up, too. He said he would burn my house down with me and my kids in it if I didn't get him that money. The next day I went and I got the money, and I brought it back to him.

Q. After that did you approach the police?

A. Yes, I did.

Q. And your reason was to get back to him for what he said?

A. No. It was because I was scared. I went over to Mike's house the 29th of October. Him and John Carr was in the living room ***.

\* \* \*

Q. Exactly what was it they were doing which frightened you?

A. Shooting heroin.

Q. What do you mean by that?

A. Taking a needle and shooting it into their veins."

Thus, the State through its redirect examination sought to show that, while Stivers' reason for telling the police about defendant's involvement in the offense was fear, it was fear of defendant and not fear of the authorities that motivated her.

■ To do this, it was important for the State to show the events that occurred between October 3 and October 29 so that the jury would know why Stivers feared defendant on the latter date but, apparently, not on the former date. Also, as defendant recognizes, Stivers' testimony was absolutely essential to the State's case, so her credibility was of the utmost importance. Regarding her credibility, in order that the jury could evaluate the comparative effect of fear of the authorities and fear of defendant on Stivers' decision to go to the police, it was important that the jury know the details of the two incidents Stivers said made her fear defendant. In view of the great importance of Stivers' credibility in this case, the probative value of evidence of the October 19 threats and the October 29 heroin use outweighed the admittedly significant prejudicial effect of that evidence. The trial court therefore properly permitted the State to elicit testimony about those events on redirect examination of Stivers.

The third instance was Stivers' testimony on redirect examination concerning a conversation she had with Lisa Rixie approximately three months prior to the April 29, 1986, trial date. Stivers testified:

"Q. [Prosecutor]: *** [H]as there been anything else *** that has frightened you?

A. Yes, there has.

Q. What, please?

* * *

A. It was probably three months ago. I can't tell you the date. I was at an A.A. meeting, and a friend of mine, her name is Lisa Rixie, she came up to me and she—

MR. KING [Defense counsel]: (Interrupting) Judge, I object to any conversation between this witness and anybody else.

THE COURT: Objection sustained.

MR. GEMIGNANI [Prosecutor]: Judge, I want to say—I will not say it in front of the jury.

THE COURT: You are offering it for what was said, not for the truth of what was said, but it was said.

MR. GEMIGNANI: That is correct.

THE COURT: Overruled; you may answer.

A. Lisa Rixie came up to me on a Sunday morning. She said, 'I have a message for you.' I said, 'Well, what is it?'

MR. KING: Judge, I object.

THE COURT: Overruled.

A. I said, 'What is it?' She said, 'Do you know Mike Chambers?' I said, 'Yeah.' I said, 'How do you know him?' And Lisa goes, 'He's in jail with my brother, Jamie.' And I don't know Jamie Rixie. I have never met Jamie Rixie. But through Lisa, through A.A. meetings, I know he's in jail for murder. She goes, 'My brother called mè and told me to tell you if you showed up at this trial, that something bad, really bad, was going to happen to your kids.'

THE COURT: You are offering that not for the truth of what was said *** to Mrs. Stivers but that this was said, is that correct?

MR. GEMIGNANI: That is correct.

THE COURT: The jury is admonished to consider it only for that purpose.

Yes?

MR. KING: Judge, I object to that. I think it is totally irrelevant. I think that the admonishment of the jury is of little or no consequence or effect. I would ask for a mistrial at this time.

THE COURT: Overruled—denied.

Q. [prosecutor]: Who was it that ostensibly told Rixie that?

A. Jamie Rixie told his sister, Lisa, that.

Q. Who told Rixie?

A. Mike Chambers.

MR. KING: Judge, I object. She does not have any idea what was going on anyplace other than this testimony.

THE COURT: Objection overruled."

In considering the propriety of admitting this testimony, it is important to first understand what it was admitted to prove.

▪ Although evidence of a defendant's attempt to intimidate a witness is admissible to show consciousness of guilt (*e.g., People v. Gambony* (1948), 402 Ill. 74, 80, 83 N.E.2d 321, 325, *cert. denied* (1949), 337 U.S. 910, 93 L. Ed. 1722, 69 S. Ct. 1045; *People v. Goodman* (1977), 55 Ill. App. 3d 294, 296, 371 N.E.2d 168, 169; see also M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801.3, at 514 (4th ed. 1984); McCormick on Evidence §273 (E. Cleary 3d ed. 1984)), the testimony at issue was not admissible for that purpose. This is because, as evidence that defendant threatened Stivers' children, the testimony would have been double hearsay, neither level of which fell within an exception to the hearsay rule (or, if a party admission is considered an exception to the hearsay rule rather than nonhearsay, triple hearsay, where only one of the levels fell within an exception to the hearsay rule). (See McCormick on Evidence §324.3 (E. Cleary 3d ed. 1984); M. Graham, Cleary & Graham's Handbook of Illinois Evidence §805.1 (4th ed. 1984).) The trial court recognized this and so did not admit the testimony as evidence that defendant had threatened Stivers' children. This is evident in the two comments of the court, which must have been rather cryptic to the jury, that the State was "offering it for what was said, not for the truth of what was said, but it was said" and "offering that not for the truth of what was said *** to Mrs. Stivers but that this was said." The State argues that defendant has waived any contention that this testimony was inadmissible as hearsay by failing to make that argument. This is beside the point, as the testimony was recognized by all in the trial court as hearsay inadmissible for the purpose of proving that defendant made threats. The issue in both the trial court and this court is whether the testimony was admissible for the purpose of proving that "it was said" to Stivers.

▪ Generally, irrelevant evidence should not be admitted. (*E.g., People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 488, 485 N.E.2d 1292, 1298.)

> " ' "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " (*People v. Monroe* (1977),

66 Ill. 2d 317, 322, 362 N.E.2d 295, 297, quoting Fed. R. Evid. 401.)

As our supreme court has said:

" 'The test of the admissibility of evidence is whether it fairly tends to prove the particular offense charged' (*People v. Peter* (1973), 55 Ill. 2d 443, 459[, 303 N.E.2d 398, 408, *cert. denied* (1974), 417 U.S. 920, 41 L. Ed. 2d 225, 94 S. Ct. 2627]), and whether what is offered as evidence will be admitted or excluded depends upon whether it tends to make the question of guilt more or less probable; *i.e.*, whether it is relevant [citation]. A trial court may reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty or its possibly unfair prejudicial nature. [Citations.] The admission of evidence is within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion. [Citations.]" *People v. Ward* (1984), 101 Ill. 2d 443, 455-56, 463 N.E.2d 696, 702.

■■ ■ Since the testimony at issue occurred on redirect examination, the rules relative to redirect examination are also of importance in this case.

"Redirect examination is generally limited to the scope of the preceding cross-examination. [Citation.] The scope of further examination rests within the sound discretion of the trial court. [Citation.]" (*City of Chicago v. Brown* (1978), 61 Ill. App. 3d 266, 274, 377 N.E.2d 1031, 1037.)

On redirect examination, a party is permitted to question a witness on matters brought out during cross-examination (*People v. Miller* (1978), 58 Ill. App. 3d 156, 161, 373 N.E.2d 1077, 1081) and, accordingly, may ask a witness questions designed to remove unfavorable inferences or impressions raised by the cross-examination (*People v. Sanchez* (1979), 73 Ill. App. 3d 607, 610, 392 N.E.2d 378, 379). There are limits to what a party may do to rehabilitate a witness. Improper material should not be admitted under the guise of rehabilitation. (*People v. Wilson* (1984), 123 Ill. App. 3d 798, 805, 463 N.E.2d 890, 895.) Moreover, when meeting an attack on a witness' credibility, "[t]he rehabilitating facts must meet a particular method of impeachment with relative directness. The wall, attacked at one point, may not be fortified at another and distinct point." McCormick on Evidence §49, at 116 (E. Cleary 3d ed. 1984), citing *Gertz v. Fitchburg R.R. Co.* (1884), 137 Mass. 77, 78 (Justice Holmes, writing for the court, distinguished cases in which evidence offered as rehabilitating was admissible from those in which such evidence was inadmissible on

the basis of whether the evidence was directed to the reason a witness should not be believed which underlay the particular mode of impeachment which had been employed).

●■ Further, even if evidence is relevant it may not be admissible. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." (*People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 489, 485 N.E.2d 1292, 1299; see *People v. Monroe* (1977), 66 Ill. 2d 317, 323, 362 N.E.2d 295, 297 ("Admissibility may also depend upon whether the probative value of the evidence outweighs its prejudicial effect to the defendant. [Citations.]"); *People v. Rodriguez* (1982), 107 Ill. App. 3d 43, 48, 437 N.E.2d 441, 445 ("However, even where factors are present which justify admitting evidence of other offenses, such evidence must be rejected where its prejudicial effect clearly outweighs its probative value. [Citations]").) As we have held, "[E]ven highly relevant evidence must be weighed against its prejudicial impact on the jury, and this is a matter within the sound discretion oi the trial court." *People v. Harris* (1980), 91 Ill. App. 3d 112, 114, 414 N.E.2d 755, 757.

The testimony at issue came in response to the State's question as to whether anything else had frightened Stivers. Evidence of that fear, however, should not have been admitted.

Stivers' fear was not relevant to any of the elements of the residential burglary for which defendant was being tried. The State has never argued that it was. Rather, the State argues that it was in some way relevant to an issue concerning Stivers' credibility which defendant raised during his cross-examination of her.

The State has accurately described the pertinent questions defendant asked of Stivers on cross-examination as going to "why does the witness a) come forward and give the police an initial statement? and b) why does the witness now have further testimony that she did not include in that statement?" The testimony at issue was not admissible with respect to either of these issues.

Regarding the first issue raised on cross-examination, the testimony at issue is obviously irrelevant. The conversation between Stivers and Lisa Rixie occurred several months after Stivers came forward and gave her initial statement. Any fear Stivers felt as a result of that conversation could not have affected her decision several months earlier to come forward and give a statement.

Regarding the second issue raised on cross-examination, the State, after Stivers testified that she was "a recovering alcoholic and recovering drug addict," elicited the following testimony:

"Q. [Prosecutor]: How long were you a drug addict?

A. [Stivers]: Probably ten years.

Q. How long have you been dry?

A. *** [T]he 5th of May I'll be dry for five months.

Q. 5th of May, this year?

A. This year; I went into treatment in October of '84, and I met Mike in my relapse. I started shooting cocaine.

\* \* \*

Q. So when you gave this statement, you were shooting cocaine?

A. Not at the time, I hadn't shot any cocaine since September 28. Then I shot cocaine again the 19th of October. That was the last day I shot cocaine.

Q. Have the facts of this event of the 3rd of October, have they become more clear as you have become less—

A. (Interrupting) Yes, they have.

\* \* \*

Q. What, if anything, has made you become more clear?

A. I haven't used drugs or alcohol.

Q. What has that done to your mind?

A. It's defogged it. I can think. I can feel."

Thus, Stivers explained that she remembered more at the time of trial than when she had made the statement on October 30 of the previous year because of the beneficial effect of no longer using alcohol or drugs.

●■ The testimony at issue concerning the conversation between Stivers and Lisa Rixie was elicited immediately after Stivers' testimony explaining why she remembered more. Yet, she never testified that she included more details at trial than in her initial statement because of fear resulting from her conversation with Lisa Rixie. In fact, she never testified that she was frightened while testifying. The artfully phrased questions on redirect only elicited that the conversation was something that had frightened Stivers, making no connection between that fear and her improved memory.

The testimony at issue, that Stivers was afraid at some undesignated time as a result of her conversation three months before trial with Lisa Rixie, appears to have no bearing on why Stivers included more details in her trial testimony than in her initial statement. It was so remote, uncertain, and potentially unfairly prejudicial that it had little, if any, probative value with respect to that issue. The trial court abused its discretion when it failed to exclude this testimony as irrelevant.

●■ The testimony was purportedly offered to rehabilitate Stivers. However, the testimony's little, if any, probative value and the prosecutor's elicitation of the details about the content of the alleged threat made in jail and that defendant was alleged to be the source of the threat, indicate that the prosecutor was in reality placing improper material before the jury under the guise of rehabilitation. For this reason, as well, the trial court's failure to exclude the testimony was an abuse of discretion.

It should also be apparent, from our discussion, that even if the testimony were somehow relevant, it should have been excluded because its probative value was substantially outweighed by its danger of unfair prejudice. The testimony's modest probative value has already been noted. The danger of unfair prejudice from it was great. Not only did the testimony indicate that defendant may have committed another crime (see Ill. Rev. Stat. 1987, ch. 38, par. 32—4), it indicated that defendant was attempting to prevent Stivers from testifying against him and so that defendant was conscious of his own guilt. Particularly in view of the obscurity of the trial court's admonitions to the jury as to the purpose for which the testimony was being admitted, the danger of such misuse of the evidence was great. Even with fuller admonitions, the testimony's probative value was so far outweighed by the danger of its unfairly prejudicing defendant that it should not have been admitted. For this reason, too, the trial court's admission of the testimony was an abuse of discretion.

●■ The State also contends that the testimony at issue was "invited" by defendant's cross-examination of Stivers. (See *People v. Davis* (1981), 92 Ill. App. 3d 426, 429, 416 N.E.2d 69, 71; *People v. Marino* (1980), 80 Ill. App. 3d 657, 666, 400 N.E.2d 491, 498.) In other words, the State contends that even if the testimony was irrelevant it was admissible under the doctrine of curative admissibility. There are three different rules concerning curative admissibility, each of which is supported by Illinois Supreme Court cases. (See *People v. Higgins* (1979), 71 Ill. App. 3d 912, 931, 390 N.E.2d 340, 354 (and cases cited therein); *People v. Wilbert* (1973), 15 Ill. App. 3d 974, 984-85, 305 N.E.2d 173, 179-80 (and cases cited therein).) Modern Illinois cases on the subject have generally followed one of the three rules, finding it to be better reasoned than the others. (See *People v. Higgins* (1979), 71 Ill. App. 3d 912, 931, 390 N.E.2d 340, 354 (and cases cited therein); *People v. Wilbert* (1973), 15 Ill. App. 3d 974, 986-87, 305 N.E.2d 173, 181.) Under this rule:

> "[A]n opponent may reply [to the admission of inadmissible evidence] with similar evidence if it is needed to eradicate an un-

fair prejudice which might ensue from the original evidence. [Citations.]" *(People v. Wilbert* (1973), 15 Ill. App. 3d 974, 984-85, 305 N.E.2d 173, 180.)

As the *Higgins* court elaborated:

"The doctrine of curative admissibility, under this approach, is not intended to operate as a panacea for parties who fail to raise proper and timely objections to what should have been inadmissible evidence. It does not permit a party to introduce irrelevant evidence, merely because his opponent brought out some evidence on the same subject. [Citation.] Rather, the doctrine of curative admissibility is limited in scope and design to those situations where its invocation is deemed necessary to eradicate *undue* prejudicial inferences which might otherwise ensue from the introduction of the original evidence. The decision of whether to admit curative evidence lies within the sound judicial discretion of the trial judge." (Emphasis in original.) *People v. Higgins* (1979), 71 Ill. App. 3d 912, 931, 390 N.E.2d 340, 354.

●■ As previously noted, the State has correctly identified the two significant areas into which defendant inquired during cross-examination. These were (1) the reasons Stivers went to the police on October 29 and gave a statement on October 30 when she had not done so previously even though she had known about the offense since October 3 and (2) the details in Stivers' trial testimony that were absent from her initial statement to the police. The redirect testimony of Stivers regarding her conversation with Lisa Rixie was not admissible in response to this cross-examination for at least four reasons.

First, it is questionable whether the testimony at issue could be considered similar to any evidence adduced by defendant on cross-examination. It concerned a conversation Stivers was not cross-examined about at a time Stivers was not cross-examined about. In addition, Stivers did not connect the testimony at issue to either of the areas she was cross-examined about. Second, there does not appear to have been any unfair prejudice to the State caused by anything adduced by defendant on cross-examination of Stivers. Third, the testimony at issue, relating only to the reasons for Stivers' fear at an unspecified time and not to either of the areas of the cross-examination, could be of no use in eradicating any unfair prejudice resulting from the cross-examination. And fourth, since the State had already offered testimony as to why Stivers went to the police when she did and why her memory of events in October was better at the time of

trial than at the time she made her initial statement, even if the testimony at issue could somehow have been useful in eradicating some unfair prejudice resulting from the cross-examination, it would not have been necessary for that purpose.

For each of these reasons, the testimony at issue was not admissible under the doctrine of curative admissibility. Therefore, assuming *arguendo* that the trial court premised the admission of the testimony at issue upon the doctrine of curative admissibility, the trial court abused its discretion by admitting that testimony.

●■ The State contends alternatively that the admission of the testimony at issue should be held harmless error. As was previously noted, the testimony of Stivers was crucial to the State's case. Her credibility was impeached by her having been an alcoholic and drug addict around the time of the events about which she testified; by the omissions in her initial statement when compared with her trial testimony; and by the question regarding her motives for assisting in the prosecution of defendant. The improperly admitted testimony could have led the jury to conclude that defendant had committed another crime while in jail. "The erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." (*People v. Lindgren* (1980), 79 Ill. 2d 129, 140, 402 N.E.2d 238, 244.) The risk of prejudice from the testimony at issue was even greater than that in most cases of the erroneous admission of other crimes evidence. The danger was that the jury would believe that defendant had threatened to harm Stivers' children if she testified, indicating consciousness by defendant of his own guilt. Moreover, the jury could have found Stivers more credible in light of the lengths to which defendant was willing to go to keep her from testifying. Since Stivers' testimony, and so her credibility, were crucial to the State's case, this high risk of prejudice precludes our holding the error harmless.

We also do not find that the trial court's attempt to have the jury consider the evidence for only a limited purpose made this potentially highly prejudicial error harmless. (See *People v. Huber* (1985), 131 Ill. App. 3d 163, 167, 475 N.E.2d 599, 602 (the erroneous admission of potentially highly prejudicial hearsay was not harmless in a bench trial, despite the trial judge's statements that he did not consider the evidence for the purpose of determining the truth of the matter asserted and accepted it only for a restricted purpose).) This is particularly true in the case at bar, where the trial court's admonitions to the jury not to consider the testimony for the truth of the matter asserted were sufficiently cryptic and understated that we have substan-

tial doubt that they were understandable to the nonlaw-trained jurors who heard this case. The jury was instructed:

"Any evidence that was received for a limited purpose should not be considered by you for any other purpose."

(See Illinois Pattern Jury Instructions, Criminal, No. 1.01 (2d ed. 1981).) This instruction could not have improved the jury's comprehension of the trial court's obscure admonitions as to the purpose for which Stivers' conversation with Lisa Rixie was being admitted.

The testimony of Stivers about her conversation with Lisa Rixie was not admissible, and its erroneous admission was not harmless. Defendant is therefore entitled to a reversal of his conviction and remand of this cause for a new trial.

We will also consider the remaining aspect of defendant's first issue, which is likely to recur on retrial of this cause. See *People v. Wilson* (1987), 116 Ill. 2d 29, 42, 506 N.E.2d 571, 576.

Defendant contends that the trial court "erred in allowing Detective Benny to testify *** that after talking with Sheila Stivers, he obtained an arrest warrant for [defendant]" because "[t]estimony concerning an arrest warrant is not relevant unless the testimony is probative on a specific issue in the case." In support of this contention, defendant cites *People v. Wilson* (1987), 116 Ill. 2d 29, 52, 506 N.E.2d 571, 581.

The arrest warrant at issue in *People v. Wilson* was for an offense committed prior to the offense for which the defendant was being tried. (*People v. Wilson* (1987), 116 Ill. 2d 29, 506 N.E.2d 571; see *People v. Salazar* (1988), 126 Ill. 2d 424, 454-56, 477-79 (opinions of the court and of Clark, J., dissenting).) The rule applied in *People v. Wilson* is inapplicable to the case at bar, in which the arrest warrant at issue was for the offense at bar and not for a previous offense.

●■ ■ The admissibility of the testimony at issue is governed by another rule. As was stated in *People v. Olivas*:

"It has uniformly been held that evidence concerning acts which are closely and inextricably mixed up with the history of the guilty act itself as to form part of one chain of relevant circumstances is admissible. [Citation.]" (*People v. Olivas* (1976), 41 Ill. App. 3d 146, 150, 354 N.E.2d 424, 428.)

Further:

"[T]he prosecution may introduce evidence as a narrative of police activities leading to the arrest and subsequent identification of a defendant." (*People v. McNair* (1981), 102 Ill. App. 3d 322, 332, 429 N.E.2d 1233, 1240.)

(See also, *e.g.*, *People v. Sessions* (1968), 95 Ill. App. 2d 17, 24, 238

N.E.2d 94, 98-99 ("In a criminal prosecution, the State may offer a continuous narrative of the events that formed the context of the arrest. [Citations]").) The arrest warrant's issuance was a part of the narrative of police activities leading to defendant's arrest and was intertwined with the circumstances of the arrest (see *People v. Davis* (1981), 93 Ill. App. 3d 187, 192, 416 N.E.2d 1179, 1182-83). Testimony that an arrest warrant was issued was therefore properly admitted.

Defendant's third issue, in which he contends that he "was denied his sixth amendment right to confront the witnesses against him by the trial court's erroneous admission of hearsay evidence which improperly bolstered the credibility of the State's primary witness, Sheila Stivers," could also recur on remand. However, this issue, which was not raised in the trial court in the specific terms argued on appeal, was not included in defendant's post-trial motion. Since this cause is being remanded for a new trial on other grounds, we decline to consider this waived issue under the plain-error doctrine. See 107 Ill. 2d R. 615(a); *People v. Andino* (1981), 99 Ill. App. 3d 952, 954-55, 425 N.E.2d 1333, 1335.

The judgment of the circuit court is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

UNVERZAGT, P.J., and WOODWARD, J., concur.