THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANGEL PEREZ, Defendant-Appellant.

First District (6th Division)   No. 1—91—1104

Opinion filed January 14, 1994.—Supplemental opinion filed on denial of rehearing March 18, 1994.

Michael J. Pelletier and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and William Toffenetti, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

The defendant, Angel Perez, and Edwin Ruiz were indicted for attempted first degree murder, armed violence and aggravated battery. The defendant was tried before a jury, and Ruiz was tried simultaneously in a bench trial. The defendant was convicted of aggravated battery and armed violence and acquitted of attempted murder. The aggravated battery conviction merged into the armed violence conviction because it formed the predicate felony for the armed violence conviction. Ruiz was found guilty of attempted first degree murder, armed violence and aggravated battery. Both were sentenced to 25 years' imprisonment. Ruiz' appeal is not before this court.

The defendant assigns several grounds for a new trial; he also

contends that his sentence was improper; but he does not question the sufficiency of the evidence to establish his guilt beyond a reasonable doubt.

On March 25, 1988, Dennis Botts and his brother, Fred Botts, were in a car going down Clybourn Avenue in Chicago. Dennis, who was 24 years old, was driving; Fred, who was 27 years old, was in the passenger seat. As they approached the intersection of Diversey and Damen, Dennis noticed a group of men standing by a car. Near the car was a man, later identified as the defendant, who was making hand signals in a downward motion. While waiting in traffic, Dennis saw in his rear view mirror Ruiz running toward the car on the passenger side. The defendant pulled twice at the driver's side door handle and screamed, "They're Royals, they're Royals." The door handle was broken on the outside and the door could not be opened. As the defendant pulled on the door, Dennis heard a gunshot. He turned his head and saw that Fred had been shot in the neck. Dennis looked at Ruiz, who pointed the gun at Dennis; he pulled the trigger but the gun misfired. Dennis Botts later identified the defendant and Ruiz. Fred Botts was unable to identify anyone.

The police arrived and took Fred Botts to a hospital. Botts was in the hospital for nine days and had surgery to remove a bullet from his neck.

From a bronze colored 1974 Ford Mustang with license plates that were traced to the defendant, the police recovered a .9 millimeter pistol with 11 live rounds in it. The car was parked in front of the defendant's house. The shooting took place a few houses from where the defendant lived.

A police firearms examiner testified that the bullet recovered from Fred Botts had been fired from a gun with five lands and grooves with a right-hand twist. The .9 millimeter pistol recovered from Perez' automobile also had five lands and grooves with a right-hand twist. Since the bullet recovered from Fred Botts was mutilated, he could not form an opinion as to whether the bullet recovered from Fred Botts was fired from the recovered gun. Dennis Botts testified that the recovered gun looked like the gun he saw in Ruiz' hand.

A police gang crimes specialist testified that Ruiz was affiliated with a gang called the Insane Deuces and the defendant was affiliated with a gang identified as the Insane Unknowns. the Insane Deuces and Insane Unknowns were part of the "People's Nation." The "People's Nation" is an enemy of the "Folk Nation," which includes the "Royals," a shortened name for the "Simon City Royals." The hand signal made by the defendant to Dennis Botts was that of the Folk Nation, and a downward motion of that signal was a sign of disrespect for the Folk Nation.

Gunshot residue tests were administered on the hands of Ruiz. The samples taken from Ruiz' right palm and left hand indicated that Ruiz had discharged a firearm, had been in the environment of a discharged firearm or had handled a discharged firearm.

The defense was an alibi. Donna Gromosko, the defendant's fiancee, testified that she lived with her mother, Dorothy Pastorino, at 2832 N. Clybourn. At 3:30 p.m. on March 25, 1988, she and the defendant were in their bedroom when the defendant got up and said he heard something, and then looked out the window. He then left the house.

Dorothy Pastorino testified that she heard what sounded like a gunshot from her bedroom window, which faced the street. She ran to the window to look outside. The defendant came into her room to look outside. He remained in her room for about a half hour.

The defendant testified that he was in the bedroom with his fiancee, heard a shot, and then looked out the bedroom window. He went to Dorothy's room and looked out her bedroom window that faced the street. He saw many people outside, walking southbound toward Diversey. He went outside and walked toward the crowd. Later that afternoon the police came to his home, took him to the station and placed him in a lineup. After being identified, he told the police that he spent the day with his girl friend Donna and that they were in the bedroom when he heard a shot. He knew Ruiz from the neighborhood but was not with him at any time on March 25. He did see Ruiz running when he looked out Dorothy's front bedroom window. He testified that he owned a 1978 Delta '88 and that he never drove a Ford Mustang. His Delta '88 was abandoned on Southport Avenue about five or six months before the shooting. The license plates recovered from the Ford Mustang were his, but they were on the Delta '88 when it was abandoned. He admitted that he was a member of the Insane Unknowns, but was not affiliated with them presently.

On cross-examination he testified that when he left his girl friend's apartment he told an officer about seeing Ruiz running down the street. He denied he told the police that Ruiz tried to hide his head with a hood.

In rebuttal Sergeant Sappanos testified that he interviewed the defendant after he was taken to Area 6 detective headquarters. After he was identified in the lineup, the defendant told him that, at 3:30 p.m., he was in the bedroom with Donna, heard a shot and looked out the window. The defendant told Sappanos that he saw Ruiz running toward an alley, trying to hide his face with a hood. Sappanos also talked to Donna Gromosko. She told him that the defendant was with her the entire day in the house, that she heard nothing at 3:30 p.m. and that the defendant did not leave at that time.

The defendant first contends that he was provided ineffective assistance of counsel because he allegedly elicited prejudicial hearsay evidence during the cross-examination of a police officer.

Before trial the defendant's attorney moved *in limine* to prohibit the State from eliciting any testimony concerning statements allegedly made by a "cooperating individual" to certain police officers on the ground that such testimony would be hearsay. The prosecutor told the judge that the police officer's testimony would not include the contents of the conversation, that the officer would testify only that he had a conversation with an individual and to what the officer did as a result of having the conversation. The judge ruled that the State could not elicit the contents of the conversation.

Officer Whalen testified that he investigated the shooting at about 4:20 p.m. on March 25; he was approached by a "concerned citizen" at the corner of Diversey and Wolcott. He had a conversation with this "concerned citizen," and after he had the conversation he went to 2832 Clybourn Street, where he observed a 1974 bronze colored Ford Mustang. He "ran" the license plate on the Ford and learned it belonged to the defendant. He then moved a brown bag from the trunk of the Ford and observed inside the bag a .9 millimeter pistol.

During cross-examination the following occurred:

"Q. The person that you spoke to did not indicate to you they knew that they observed the shooting, did they?

A. That's not true.

Q. They did tell you that?

A. Yes, he did.

Q. Did that person describe for you the person involved in the shooting?

A. Yes, sir.

Q. This person gave you a description?

A. Brief one.

Q. Did the person mention any names to you?

A. No, sir.

\* \* \*

Q. The description that that person gave you, did you record that or document that description anywhere?

A. No, sir.

Q. How many persons did this person describe to you?

A. He saw two people running.

Q. But he never told you he saw the shooting himself, is that right?

A. That's not true."

The defendant's attorney also brought out that the officer was not taking notes when he talked to the concerned citizen. Although he

made a report, the officer did not include the description the citizen had given him; the report did not contain the fact that the citizen told him that he had seen the shooting.

On redirect examination the following occurred:

"Q. You did not reveal the identity of that person, is that correct?

A. No, sir.

Q. Why didn't you do that, officer?

[DEFENSE ATTORNEY]: Objection, Judge.

[STATE'S ATTORNEY]: Judge, I think he's trying to impeach this witness as if he's attempting to hide something.

[JUDGE]: I'm going to permit the inquiry.

[STATE'S ATTORNEY]: Thank you. Officer, would you please tell the ladies and gentlemen why you did not list the person that you had the conversation with?

A. He asked that he not be named because he's familiar with the gangs in the area and he knows how they operate and if they found out that he would cooperate with the police he feared for the safety of himself and the family.

[DEFENSE ATTORNEY]: Object. Ask that be stricken from the record and the jury be admonished.

[JUDGE]: I am going to strike that. I am going to ask the ladies and gentlemen of the jury not to consider the statement of the officer. Sustained."

The prosecutor then brought out that the witness had told Whalen that he witnessed the shooting and saw the persons involved throw the weapon into the trunk of the vehicle from which the officer recovered the gun. On re-cross-examination, Whalen admitted that he did not check the vehicle identification number of the Mustang with the Secretary of State to ascertain if it was registered to the defendant.

◼ We do not agree that the defendant's attorney's cross-examination deprived the defendant of effective assistance of counsel. Proper examination by the prosecution established that Whalen had spoken to an unidentified citizen and after that conversation Whalen searched the trunk of a car and recovered a pistol. (See *People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146.) The jurors would logically infer from the properly admitted evidence that the unidentified citizen gave Whalen information that led him to search the car. The defendant's attorney had every reason to believe that the "concerned citizen" had not given a description to the police and had not seen the shooting because that information was not in the police report. When the officer surprised the defendant's attorney by his testimony, the defendant's attorney properly brought out that

that information was not in the report. The defendant's attorney made effective use of the absence of that information in Whalen's report during closing argument. He also argued effectively to the jury that Whalen had failed to check the vehicle identification number on the Ford Mustang with the Secretary of State. In our judgment, the defendant's attorney's cross-examination had an adverse effect on the credibility of Whalen and, consequently, his cross-examination did not constitute ineffective assistance.

The defendant next contends that the testimony of Whalen that he did not disclose the identity of the "concerned citizen" because of the citizen's fear of gang retaliation was prejudicial error. After the objection was sustained to the answer of Whalen and the jury instructed to disregard his answer, the State later repeated the question. Over the objection of the defendant's attorney, the judge said he would permit "a very limited inquiry." Whalen then testified that he did not put the witness' name in the report, "because he did not want to give it to [the police]." The defendant now makes no claim of any error in Whalen's second answer, nor do we believe he could properly do so. A party should always be able to explain the absence of evidence, subject, of course, to the limitation that the explanation for the absence of evidence is not prejudicial. Whalen's second answer was not prejudicial. The question is whether his first answer was.

■ The jury was already aware through proper evidence of the defendant's affiliation with a gang and that the shooting was gang related. The answer of Whalen established only that the unknown witness was afraid of gangs in general, not the defendant. In this regard, this case differs from the cases which condemned arguments by the prosecutors or proof that the defendant had intimidated witnesses or that witnesses were afraid of retaliation by the defendant. (See, *e.g.*, *People v. Johnson* (1990), 202 Ill. App. 3d 417, 559 N.E.2d 1041; *People v. Chambers* (1989), 179 Ill. App. 3d 565, 534 N.E.2d 554; *People v. Lopez* (1987), 152 Ill. App. 3d 667, 504 N.E.2d 862; *People v. Dace* (1983), 114 Ill. App. 3d 908, 449 N.E.2d 1031; *People v. Brown* (1983), 113 Ill. App. 3d 625, 447 N.E.2d 1011.) We judge from all the circumstances that the answer of Whalen did not prejudice the defendant to the point that the answer was reversible error. We also judge, contrary to the defendant's argument, that his attorney's cross-examination did not open the door for the introduction of the evidence of the reason the witness refused to give his name. Finally, any prejudice that did arise was substantially diffused by the trial judge when he sustained the defendant's objection and instructed the jury to disregard the testimony. See *People v. Gonzalez* (1991), 142 Ill. 2d 481, 568 N.E.2d 864.

The defendant's next claim is that reversible error occurred during the State's closing argument in which the prosecutor told the jury that the defendant was the "instigator, the boss, the person that called the shots." The defendant maintains that there was no evidence to support that argument. The State answers first that this claim is waived because the defendant failed to object during the closing argument at trial and failed to raise the issue in his post-trial motion. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Second, the State asserts that any alleged error in the closing argument does not rise to the level of plain error. Third, the State argues that the closing argument was based on reasonable inferences from the evidence. We agree with all three arguments of the State.

■ Dennis Botts saw the defendant in the street making downward gang signs as he and his brother passed; Dennis saw the defendant in his rear view mirror and saw the codefendant running up to the car; the defendant appeared at his window, trying to pull the door open; and the defendant screamed, "They're Royals, they're Royals." We agree with the State that an inference may be drawn that the defendant flashed the signs at suspected rivals to identify hostile gangs in the defendant's gang's territory. It was the defendant who identified the Botts brothers, although mistakenly, as members of a rival gang. It is also a reasonable inference that the defendant distracted the driver so that Ruiz could approach without suspicion. We repeat that the argument that the defendant was the instigator of the plan to shoot was a reasonable inference for the jury to draw.

The defendant's last claim is that the trial judge abused his discretion in sentencing him to the identical sentence imposed on Ruiz. The defendant maintains that the judge improperly considered his culpability to be equal to Ruiz, even though the defendant was acquitted of attempted murder. We conclude that the trial judge did not abuse his discretion in finding that the defendant and Ruiz were equally culpable in sentencing them to identical terms of imprisonment. The defendant relies principally on *People v. House* (1975), 26 Ill. App. 3d 330, 325 N.E.2d 69, in which two defendants were sentenced to 8 to 24 years' imprisonment for armed robbery. One defendant, Dawdy, was 28 years old and had "a substantial record of prior criminal [conduct]." (*House*, 26 Ill. App. 3d at 333.) In 1961 he was placed on probation as a juvenile; he violated his probation and was later committed to the Youth Commission. He was sentenced in 1964 for forgery, paroled and returned to prison as a parole violator. In 1973 he was convicted of two battery offenses and two theft offenses. The defendant was 19 years old and had one prior conviction for forgery. The appellate court, noting the disparity between the re-

cords of House and Dawdy, reduced House's sentence to 4 to 12 years' imprisonment.

■ In this case, there is a disparity in the backgrounds of the defendant and Ruiz, but it is the defendant who suffers by comparison. On October 22, 1987, the defendant pleaded guilty to unlawful use of weapons and was on conditional discharge when he participated in the shooting of Fred Botts. On December 17, 1987, he was arrested on a weapons charge to which he pleaded guilty and received supervision while on bond in this case. Also while on bond in this case, he pleaded guilty to a delivery of a controlled substance on October 4, 1989, and to felony theft on September 3, 1989. Ruiz' only conviction was for possession of a stolen automobile in 1985 for which he received three years' probation.

The defendant's argument that he is entitled to a lesser sentence than Ruiz because he was acquitted of attempted murder is equally unavailing. In *People v. Allen* (1992), 153 Ill. 2d 145, 606 N.E.2d 1149, the defendant argued that his constitutional guarantee of a proportionate penalty was violated when he was sentenced as a Class X offender for an armed violence conviction, when the jury failed to return a verdict on the charge of attempted murder. Although the defendant in *Allen* did not raise the proportionate penalty argument vis-a-vis another defendant, the supreme court offered its reasoning for the lack of disparity in sentencing:

> "We note, however, that there is nothing incongruous in a jury's finding a defendant not guilty on an attempted murder charge and finding the same defendant guilty on an aggravated battery charge. *** A jury may conclude that a defendant intentionally or knowingly caused great bodily harm to a victim, but did not have the specific intent to kill.
>
> Defendant correctly asserts that attempted murder is a more serious offense than aggravated battery. When aggravated battery is committed while carrying a dangerous weapon, however, and the State secures a conviction for armed violence, the legislature has made the determination that the offense shall carry the same penalty as attempted murder." (*Allen* 153, Ill. 2d at 153-54.)

Thus, the trial judge in this case set the penalty in accordance with the prescribed range set by the legislature. The trial judge did not abuse his discretion in sentencing.

The judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and GIANNIS, JJ., concur.

## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

PRESIDING JUSTICE EGAN delivered the opinion of the court:

In his petition for rehearing the defendant claims that his conviction for armed violence should be reversed because enhancement of his aggravated battery conviction "would not serve the deterrent purpose of the armed violence statute."

In his original brief, the defendant contended that the deterrent purpose of the armed violence statute is not served in this case because the predicate felony (aggravated battery) is based on accountability and there was no evidence that the defendant was armed or knew that the codefendant was armed or would use a weapon. His petition for rehearing repeats that argument. In its original brief, the State responded that, in effect, the defendant asks this court to add an element of concurrent and specific intent to all potential crimes carried out during the course of criminal conduct to support a conviction based on accountability. The State asserted that this type of claim would dramatically undermine the force of the accountability principle in prosecutions for armed violence. We agree.

■ A person commits armed violence when, while armed with a dangerous weapon, he commits any felony defined by Illinois law. (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2.) Our supreme court has excepted two crimes as possible predicate felonies (voluntary and involuntary manslaughter) as the basis for an armed violence conviction because these underlying crimes are spontaneous and lack premeditation. (*People v. Alejos* (1983), 97 Ill. 2d 502, 455 N.E.2d 48 (voluntary manslaughter); *People v. Fernetti* (1984), 104 Ill. 2d 19, 470 N.E.2d 501 (involuntary manslaughter).) The defendant suggests that this exception should be extended to this case, *i.e.*, when the defendant's armed violence conviction is based on accountability and he did not specifically intend or foresee the use of a dangerous weapon during the commission of the aggravated battery. The supreme court, however, refused to extend the exception to include aggravated battery because the offense of aggravated battery does not have a mitigating mental state. See *People v. Allen* (1992), 153 Ill. 2d 145, 606 N.E.2d 1149 (only legislature may amend aggravated battery statute to recognize mitigating factors or amend armed violence statute to clarify that it may not be predicated on an offense which is motivated by a mitigating mental state).

The defendant argues that if he is to be punished under the armed violence statute, at a minimum, the evidence should have shown that he carried a weapon or somehow overtly planned the use of a dangerous weapon during the shooting. The defendant claims

that there was no evidence that he was armed, knew that his codefendant was armed, that he had access to a weapon, or that he intended to facilitate a felony while his codefendant was armed. The defendant, however, cannot escape the extent of the common design rule: a defendant is responsible for unplanned crimes committed during the course of planned criminal conduct. The rule of responsibility for common design applies to armed violence. (*People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746.) The defendant admitted in his original brief that he and Ruiz "shared a common purpose to harm the complainant." That the aggravated battery conviction was based on accountability does not affect the conviction: an aggravated battery conviction may serve as the predicate for an armed violence conviction. *People v. Allen* (1992), 153 Ill. 2d 145, 606 N.E.2d 1149.

The defendant claims that the common design rule is inapplicable in this case because there was no evidence of his advanced knowledge of the criminal plan or scheme. The defendant relies on *People v. Estrada* (1993), 243 Ill. App. 3d 177, 611 N.E.2d 1063. That case, however, is distinguishable. The court found defendant Estrada already had exited the car when a fellow passenger fired a gun at the victim and that mere presence in the vicinity could not support a conviction based on accountability for first degree murder.

In *Estrada*, three Hispanic males were riding around a neighborhood for 1 1/2 to 2 hours. The defendant entered their car; they stopped in front of a building where two Hispanic males were standing. The defendant and another passenger shouted "something about gangs." In his oral statement to a detective, the defendant stated that a passenger "represented" symbols for the Latin Kings, while the individuals on the street flashed Two-Sixer gang signs. The defendant then exited the car with a tire iron in hand. As he exited the car he heard two shots. He chased one of the individuals, broke off the chase, and then broke a first-floor window of the building where one of the individuals entered. The court found that there was no direct evidence tying the defendant to a common design to shoot the victim. This conclusion was premised on the fact that the defendant already had exited the car when a fellow passenger fired the gun. The court also noted that it was less likely that the defendant would have exited the car to pursue the victim on foot had he known that he might have been shot at. Following the maxim that mere presence without any affirmative act is insufficient for accountability, the court reversed the conviction.

Unlike *Estrada*, the defendant in this case was not merely present, ignorant of his codefendant's actions. The evidence showed that Dennis Botts (the driver) saw the defendant "disrespecting" the Folk

764

nation, as he and Fred passed by a double-parked car and a group of men. After the Botts brothers passed, the codefendants jogged up to their car within a few seconds of each other. The defendant screamed, "They're Royals, they're Royals" and attempted to open the driver's side door. Then, Ruiz shot Fred Botts in the neck and shot at Dennis but the gun misfired. The codefendants were together at the double-parked car, they ran almost together to the victim's car, the defendant identified the Botts brothers as enemy gang members, and in response, the codefendant shot at both Botts brothers.

The supreme court refused to except an aggravated battery conviction as a predicate felony for armed violence in *People v. Allen*. The defendant's claim that the deterrent purpose of the statute would not be served in his case is merely an attempt to create another exception to the armed violence statute for predicate felonies based on accountability. Our supreme court in *Allen* noted that only the legislature may amend the armed violence statute.

The petition for rehearing is denied.

McNAMARA and GIANNIS, JJ., concur.