**UNITED STATES of America ex rel. Billy J. RHOADS, Petitioner,**

v.

**Paul BARNETT, Warden, Danville Correctional Center, Respondent.**

No. 97 C 4130.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 19, 1998.

---

Billy J. Rhoads, Danville, IL, pro se.

David Carl Thomas, Chicago Kent College of Law, Chicago, IL, John Robert Hieber, North Riverside, IL, for Petitioner.

William Lloyd Browers, Assistant Attorney General, Chicago, IL, for Respondents.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Petitioner, Billy Rhoads, filed a 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus to challenge his conviction for first degree murder. For the following reasons, the Petition is denied.

### Background [1]

On July 10, 1990, the petitioner, Billy J. Rhoads, and a codefendant, John R. Radcliffe, were charged by indictment with the murder of Steven Heitlage. *Rhoads,* No. 1–91–0620 at 1; (Resp.Supp.Ex.A). Both defendants were tried in a bench trial in the Circuit Court of Cook County, Illinois.

The evidence at trial established that Robin Leavy dated the victim, Mr. Heitlage, from the summer of 1989 until December, 1989. In January, 1990, Ms. Leavy met Mr. Rhoads and they began dating. *Id.* at 2.

---

1. The following facts are taken from the Illinois Appellate Court's unpublished opinion in *State v. Rhoads,* No. 1–91–0620 (Ill.App.Ct.1992) and the trial transcript.

Ms. Leavy, Mr. Heitlage, and Mr. Rhoads shared an apartment in April, 1990. During April Ms. Leavy learned she was pregnant. She told Mr. Rhoads that Mr. Heitlage was the father of the child. Mr. Rhoads became jealous and upset. Shortly thereafter Mr. Heitlage moved out of the apartment. *Id.*

Shawn Leslie, a friend of Mr. Heitlage and Ms. Leavy, testified that on June 3, 1990, he and Mr. Heitlage were at a fast food restaurant when Mr. Rhoads drove up to the restaurant. Mr. Rhoads told Mr. Leslie he wanted to see Mr. Heitlage to settle something with him. Mr. Leslie stopped Mr. Heitlage and Mr. Rhoads from getting near each other. Mr. Rhoads told Mr. Leslie that if he did not settle the matter at that time, he would get Mr. Heitlage later and when he did, he would kill Mr. Heitlage. *Id.* The altercation ended when Mr. Heitlage ran to a marked police car outside the restaurant and Mr. Rhoads drove away. *Id.*

Two weeks later Mr. Heitlage and Mr. Leslie were working on cars at Mr. Leslie's house when Ms. Leavy phoned. Ms. Leavy made plans to meet Mr. Heitlage that evening at a gas station not far from her house. Ms. Leavy testified she told Mr. Rhoads and Mr. Radcliffe about her plans to meet Mr. Heitlage at the gas station, eat at Wag's restaurant, and then go to a pool hall. *Id.* at 3. Driving Mr. Radcliffe's red Maverick, Mr. Rhoads and Mr. Radcliffe took Ms. Leavy to the gas station, dropped her off, and left. (Trial Tr. at 105). Mr. Heitlage arrived about a half an hour later in his Buick Regal.

After a few stops Mr. Heitlage and Ms. Leavy arrived at Wag's restaurant. They left at about 10:15 p.m. or 10:30 p.m. Upon exiting the restaurant Ms. Leavy noticed Mr. Radcliffe's red Maverick in the parking lot. (Tr. at 110). Ms. Leavy did not tell Mr. Heitlage about the red Maverick. Not long after leaving Wag's restaurant Ms. Leavy noticed Mr. Radcliffe's red Maverick alongside Mr. Heitlage's Buick Regal. Ms. Leavy did not see who was in the red Maverick. (Trial Tr. at 111).

Ms. Leavy and Mr. Heitlage proceeded to Henry Horner Park. Ms. Leavy testified they arrived at the Park at around 10:45 p.m. to 11:00 p.m. Ms. Leavy and Mr. Heitlage walked into the Park and sat down around two hundred feet from the parking lot. After a few minutes of talking Mr. Heitlage saw somebody approaching and asked who it was. Ms. Leavy turned and saw an individual dressed entirely in black. (Trial Tr. at 115). The individual ran to Mr. Heitlage and placed him in a headlock. Ms. Leavy recognized the assailant as Mr. Rhoads. (Trial Tr. at 116). Mr. Heitlage asked Mr. Rhoads not to hurt him. Mr. Rhoads told Mr. Heitlage he would not hurt him and instructed Ms. Leavy to return to the car. Before returning to the car Ms. Leavy saw Mr. Radcliffe approach. (Trial Tr. at 117–18).

Ms. Leavy retrieved her purse from Mr. Heitlage's car and got into the red Maverick. (Trial Tr. 119). About five minutes later Mr. Rhoads and Mr. Radcliffe returned to the red Maverick. When Ms. Leavy asked where Mr. Heitlage was, Mr. Rhoads told her not to worry about it and that "it would be taken care of." (Trial Tr. at 120). The three stopped at a McDonald's and then returned home. Ms. Leavy did not notice blood on either Mr. Rhoads' clothes or hands after they got home or at any other time that evening. (Trial Tr. at 163).

Later that evening Mr. Rhoads came to Ms. Leavy's bedroom and told her that he had cut Mr. Heitlage's throat and stabbed him in the back. (Trial Tr. at 123). The next day Mr. Rhoads told Ms. Leavy that if the police asked any questions she should say that she had not met Mr. Heitlage at the gas station. (Trial Tr. at 128).

Aside from Mr. Leslie and Ms. Leavy, two other witnesses testified against Mr. Rhoads. Officer G. Kanzler testified he found Mr. Heitlage's body in Henry Horner Park on June 18, 1990, at 5:10 a.m. He also testified about the condition of the body and having seen the Buick Regal parked in the parking lot at 1:00 a.m. on the morning of the murder. Detective Mark Sanders also testified for the State. Detective Sanders testified he found a knife by Mr. Heitlage's body and that his investigation led to Mr. Rhoads and Mr. Radcliffe. Detective Sanders noticed a laceration on Mr. Radcliffe's hand when he

was fingerprinted. Both officers testified the crime scene was quite bloody.

The parties stipulated that the knife was checked for fingerprints but that none were found and that black pants and a black shirt discovered in Mr. Rhoads' room, although unwashed since the night of the murder, had no bloodstains. Mr. Radcliffe was acquitted after the State rested. Mr. Rhoads was convicted and sentenced to thirty-two years in prison.

The only issue raised on Mr. Rhoads' direct appeal was whether his sentence was excessive. The Illinois Appellate Court affirmed the sentence. Mr. Rhoads filed a petition for leave to appeal the sentencing issue to the Illinois Supreme Court. Mr. Rhoads' petition was denied. (Resp.Supp.Ex. C).

Mr. Rhoads then filed a petition for state post-conviction relief, arguing ineffective assistance of counsel. (Resp.Ex. A). The State moved to dismiss the petition. The circuit court heard argument on the State's motion. Mr. Rhoads argued trial counsel was ineffective because he refused to present alibi evidence that Mr. Rhoads was actually at work at the time of the murder and did not pursue evidence that indicated the State's main witness, Ms. Leavy, might have had a pending assault case against her dropped in exchange for her testimony. (Post–Conviction Tran. at A–6 & A–7). Mr. Rhoads' petition for post-conviction relief was dismissed. The Illinois Appellate Court affirmed the dismissal and the Illinois Supreme Court denied Mr. Rhoads' petition for leave to appeal. Mr. Rhoads filed this petition for habeas corpus on June 6, 1997.

Mr. Rhoads raised five claims in his initial habeas petition: (1) his sentence was excessive; (2) ineffective assistance of trial counsel for failure to call alibi witnesses; (3) ineffective assistance of appellate counsel for failure to raise issues; (4) ineffective assistance of post-conviction counsel for failure to amend his post-conviction petition; and (5) ineffective assistance of post-conviction counsel for withdrawing from the case. On June 19, 1998, Mr. Rhoads amended his habeas petition to add additional claims: (1) failure by the State to disclose certain evidence; (2)

ineffective assistance of trial counsel for failure to obtain evidence, to properly cross-examine witnesses, and to object to the introduction of particular evidence; and (3) failure to definitively establish the time of death.

### Post–Conviction Counsel

■■■ Two of Mr. Rhoads' grounds for habeas relief are premised on ineffective assistance of counsel at the post-conviction level. A criminal defendant does not have a right to counsel to pursue post-conviction appeals. *Pennsylvania v. Finley*, 481 U.S. 551, 557, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). A criminal defendant who has no right to counsel cannot be deprived of the effective assistance of counsel. *Coleman v. Thompson*, 501 U.S. 722, 752–53, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Wainwright v. Torna*, 455 U.S. 586, 587–88, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982). Accordingly, Mr. Rhoads' claims for ineffective assistance of post-conviction counsel are without merit.

### Excessive Sentence

Mr. Rhoads argues his Fifth, Eighth, and Fourteenth Amendment rights were violated when the trial court sentenced him to thirty-two years imprisonment for first degree murder. Mr. Rhoads claims the sentencing court did not take into consideration a variety of mitigating factors. (Habeas Pet. at 6 & 6–A).

■■■ In Illinois, a criminal defendant convicted of first degree murder is to be sentenced to the penitentiary, by statute, for a term of between twenty and sixty years. 730 ILCS 5/5–8–1(a)(1)(a). Generally, federal courts will not review a sentence that falls within statutory limits. *Williams v. Duckworth*, 738 F.2d 828, 831 (7th Cir.1984)(citing cases). Mr. Rhoads' sentence was within the statutory limit and the Illinois Appellate Court found the sentence entirely appropriate. (Supp. Ex. A; *Rhoads*, No. 1–91–0620). Mr. Rhoads may still prove a constitutional violation if he can show that his sentence was "extreme" and "grossly disproportionate" to the crime. *Koo v. McBride*, 124 F.3d 869, 875 (7th Cir.1997) (citations omitted).

Mr. Rhoads was convicted of first degree murder. The sentencing court found Mr. Rhoads had no criminal background, was motivated by passion in committing murder, was employed, graduated from high school, and was unlikely to commit further crimes. (Trial Tr. at 256–59). The sentencing court also found the crime was "vicious," Mr. Heitlage was unarmed, and that Mr. Rhoads ignored Mr. Heitlage's pleas not to hurt him. Taking everything into consideration the sentencing court sentenced Mr. Rhoads to thirty-two years imprisonment, a sentence closer to the statutory minimum than the maximum.

▌ Mr. Rhoads' mitigating factors were considered by the sentencing court. He has made absolutely no showing that his sentence was disproportionate to the murder of which he was convicted. Thus, this claim fails.

*Ineffective Assistance of Appellate Counsel*

▌ Mr. Rhoads argues his constitutional rights were violated by the ineffective assistance of his appellate counsel. (Habeas Pet. at 7). "A defendant whose lawyer does not provide him with effective assistance on direct appeal and who is prejudiced by the deprivation is . . . entitled to a new appeal." *Mason v. Hanks,* 97 F.3d 887, 892 (7th Cir. 1996). The performance of appellate counsel is judged under the standard enunciated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Mr. Rhoads must show: (1) his appellate counsel's performance "fell below an objective standard of reasonableness[;]" and (2) counsel's errors prejudiced Mr. Rhoads to the extent his appeal was fundamentally unfair. *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052. "[U]nless a particular act or omission of counsel amounts to ineffectiveness per se, the petitioner must show that [the act or omission] is beyond the realm of reasonable professional judgment within the context of the case, at the time that counsel acted—that it could not be considered a reasonable tactical decision, in other words." *Mason,* 97 F.3d at 893.

▌ Mr. Rhoads claims his appellate counsel failed to raise issues of "grave importance." His only elaboration on the issues of "grave importance" is that they dealt with the "inadequacies" of his trial counsel. Mr. Rhoads cannot show that his appellate counsel was objectively unreasonable without explaining which issues his appellate counsel failed to raise. Assuming Mr. Rhoads is complaining his appellate counsel was inadequate for failing to raise an ineffective assistance of trial counsel claim, Mr. Rhoads fails to elaborate on the ineffectiveness of his trial counsel.[2] Mr. Rhoads must explain the trial counsel deficiencies his appellate counsel should have raised and why those deficiencies prejudiced his appeal. Mr. Rhoads has presented absolutely no evidence or argument on these issues. Accordingly, his claim for ineffectiveness of appellate counsel is denied.

*Waiver*

▌ "Before considering a petition for habeas corpus on the merits, a district court must make two inquiries—whether the petitioner exhausted all available state remedies and whether the petitioner raised all his claims during the course of the state proceedings." *Henderson v. Thieret,* 859 F.2d 492, 496 (7th Cir.1988). To avoid procedural default, a prisoner must first raise his claims in a state court proceeding so they may be "fairly presented" to the state court. *Moleterno v. Nelson,* 114 F.3d 629, 634 (7th Cir. 1997) (citations omitted). Once a claim is procedurally defaulted "federal habeas review of the claim[ ] is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

A number of Mr. Rhoads' claims are raised for the first time in his habeas petition amendment. Each of these claims will be considered in turn.

**2.** Mr. Rhoads does discuss ineffectiveness of trial counsel elsewhere in his habeas petition. Those claims are considered in later sections of this opinion.

## A. Time of Death.

In the final paragraph of his habeas petition amendment Mr. Rhoads, for the first time, states that Mr. Heitlage's time of death was not established by scientific evidence at trial. Since this claim is procedurally defaulted, Mr. Rhoads must prove either cause and prejudice for failing to raise the claim or that a fundamental miscarriage of justice would result if I fail to consider the claim. "Cause" is ordinarily defined as an external objective factor that impeded the defense's ability to raise the claim. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Mr. Rhoads has not alleged any external objective failure that prohibited him from raising this claim. The basis of Mr. Rhoads' claim is the failure of the "Report of Postmortem Examination" to set forth a time of death. This report has been in the record since Mr. Rhoads' trial and this claim could have been raised on any of his various state appeals.

Mr. Rhoads may still present the claim if failure to consider the claim would be a fundamental miscarriage of justice. Mr. Rhoads must prove his claim will allow him to provide evidence that he is actually innocent. *Sawyer v. Whitley*, 505 U.S. 333, 339, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). Mr. Rhoads presents no evidence that establishing the time of death will prove his innocence. Accordingly, Mr. Rhoads' claim is barred.[3]

## B. Ineffective Assistance of Trial Counsel.

Mr. Rhoads raises two ineffective assistance of trial counsel claims for the first time in his habeas petition amendment. Mr. Rhoads argues his trial counsel was ineffective for: (1) failing to cross-examine Ms. Leavy regarding whether her testimony was given in exchange for an agreement not to prosecute her for the murder of Mr. Heitlage; and (2) failing to object to the introduction of the murder weapon into evidence. Although Mr. Rhoads presented an ineffec-

tive assistance of trial counsel claim in his state petition for post-conviction relief, he did not present the above grounds as reasons for ineffective assistance of counsel. Mr. Rhoads has procedurally defaulted these claims. Thus, Mr. Rhoads must prove either cause and prejudice for the default or that failure to consider the claim will result in a fundamental miscarriage of justice.

Mr. Rhoads offers no explanation for why he failed to raise these issues in the Illinois state courts. Since Mr. Rhoads offers no external impediment to his ability to raise these claims, he cannot show cause and prejudice. Additionally, none of Mr. Rhoads' claims consist of new evidence that would prove he is actually innocent. As the Supreme Court has noted "[w]ithout any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Schlup v. Delo*, 513 U.S. 298, 316, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Accordingly, these claims are barred.

## Ineffective Assistance of Trial Counsel

Mr. Rhoads raises three ineffective assistance of trial counsel claims that are not procedurally defaulted. First, Mr. Rhoads argues that his trial counsel ignored evidence and witnesses that indicated he was at work at the time of the murder. Second, Mr. Rhoads complains his trial counsel failed to seek discovery regarding the dismissal of an assault charge against Ms. Leavy. Third, Mr. Rhoads complains his trial counsel did not cross-examine Ms. Leavy about a possible deal she made with the State to have a pending assault charge against her dropped in exchange for her testimony at trial.

While Mr. Rhoads did not raise any of these claims on direct appeal, they were included in his petition for post-conviction relief.[4] Although the post-conviction court

---

3. District courts may only entertain habeas corpus petitions based on allegations that a prisoner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. Even if I were to address Mr. Rhoads'

claim on the merits, he fails to show what possible constitutional violation occurred from the failure to establish the time of death.

4. Mr. Rhoads stated at his post-conviction hearing that his trial counsel "never inquired" into

could have denied these claims as procedurally barred, it appears the court addressed the merits of the claims in a hearing. (Post-Conviction Tran. at A–10 & A–11). It is unclear whether Mr. Rhoads' claims were ultimately dismissed on the merits or some other ground. Either way, "procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)(quotations omitted). Because neither the Illinois Appellate Court nor the Illinois Supreme Court disturbed the post-conviction court's findings, the post-conviction court is the last court to render judgment on Mr. Rhoads' claims. Since the Illinois post-conviction court did not "clearly and expressly" dismiss Mr. Rhoads' petition on procedural grounds, his claims are not defaulted.

### A. Alibi Defense.

Mr. Rhoads presented Ted Cnota's affidavit in support of his alibi defense. (Habeas Pet. Ex. D & 1/10/98 Supplemental Aff.). Mr. Cnota stated he was employed with Mr. Rhoads at Greco Graphics, a printing company, during the time period of the murder. According to Mr. Cnota, each Greco Graphics employee had an individualized security code that opened and closed Greco Graphics. Greco Graphics kept written reports containing the dates and times of its employees' openings and closings. Mr. Cnota stated the June, 1990 security logs indicated Mr. Rhoads was at Greco Graphics sometime between 11:30 p.m. and 12 a.m. on June 17, 1998. Mr. Cnota stated he told Mr. Rhoads' trial attorney, Frank Valenti, about the security records.

Mr. Cnota's testimony and the security records, if true, might have permitted a legit-imate alibi defense to be presented. Mr. Valenti's defense at trial consisted of a few stipulations and cross-examination. I therefore held an evidentiary hearing to consider Mr. Valenti's actions in not presenting an alibi defense.

At the hearing, Jerry Falk, a Greco Graphics employee, testified that he viewed Greco Graphics' June, 1990 security logs. According to Mr. Falk, Mr. Rhoads' personal identification number ("PIN") was used to open Greco Graphics on June 17th between 11 p.m. and 12 a.m. Mr. Cnota also testified. He supported Mr. Falk's testimony regarding the use of Mr. Rhoads' PIN. Mr. Cnota also testified that he informed Mr. Valenti about the security logs and that Mr. Valenti told him to hold onto the records.

Mr. Valenti testified that he knew about the records but, after consultation with Mr. Rhoads, chose not to use the records. According to Mr. Valenti, after being arrested Mr. Rhoads gave a statement to the police that he had not been near Henry Horner Park on the day of the murder. Since Greco Graphics was only about a mile away from Henry Horner Park, the records would have contradicted Mr. Rhoads' statement and placed him near the murder scene at the time of the murder. Additionally, Mr. Valenti believed that if he proffered an alibi defense he would have to turn the security logs over to the police. Consequently, the police might decide to search Greco Graphics or Greco Graphics' hazardous waste disposal site. During his testimony, Mr. Valenti indicated that a search might have revealed a knife and blood-stained clothing. Mr. Valenti testified Mr. Rhoads told him he had, in fact, gone to Greco Graphics after the murder and left those items at Greco Graphics.[5] Mr. Valenti also recalled that he called Greco Graphics after the murder and was informed that Mr. Rhoads left the employ of Greco Graphics a week before the murder.

---

the dismissal of the assault case against Ms. Leavy. I find that Mr. Rhoads raised issues of his trial counsel's failure to seek discovery and failure to cross-examine by stating his claim in this manner.

**5.** When a client raises a claim of ineffective assistance of counsel he waives the attorney-client

privilege regarding communications relevant to the issue of adequacy. *Tasby v. United States,* 504 F.2d 332, 336 (8th Cir.1974), *cert. denied,* 419 U.S. 1125, 95 S.Ct. 811, 42 L.Ed.2d 826 (1975); *Laughner v. United States,* 373 F.2d 326 (5th Cir.1967). Mr. Rhoads denies he told Mr. Valenti about the knife and clothes.

Mr. Valenti also testified about his trial strategy. In lieu of an alibi defense, Mr. Valenti attempted to show reasonable doubt by focusing on the total lack of physical evidence tying Mr. Rhoads to Mr. Heitlage's murder. Although there was testimony the crime scene was quite bloody, Ms. Leavy never noticed blood on either Mr. Rhoads' clothing or hands. Mr. Valenti offered a stipulation that Ms. Leavy identified the clothing Mr. Rhoads wore on the night of the murder. The clothing was tested and there was no blood on the clothing. Additionally, the knife found at the murder scene had no fingerprints and, based on the type of cuts on Mr. Heitlage, may not have been the knife used in the murder. Mr. Valenti also tried to suggest that an individual named Rafael was responsible for the murder. A pair of sunglasses allegedly belonging to Rafael were found in Mr. Heitlage's car.

Mr. Rhoads also testified at the evidentiary hearing. He contradicted his first two witnesses. Mr. Rhoads stated he and Mr. Radcliffe went to Greco Graphics at around 8 p.m. or 8:30 p.m. on June 17th, worked for two to two and a half hours, and then drove home. Mr. Rhoads said he returned to Greco Graphics to work at around 3:30 a.m. or 3:45 a.m. on June 18th. Mr. Rhoads testified that he told Mr. Valenti all of this information at his trial even though he told police he had not been at work on June 17th.

 Under *Strickland*, a defendant must show that defense "counsel's representation fell below an objective standard of reasonableness," and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 688, 694, 104 S.Ct. 2052. In determining whether counsel's performance was deficient, the court will ask whether counsel's conduct was within the wide range of professional competence demanded of attorneys in criminal cases. *Id.* at 688, 104 S.Ct. 2052. The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is,

the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052 (citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

 It was not objectively unreasonable for Mr. Valenti to refuse to offer an alibi defense. An alibi defense would have contradicted Mr. Rhoads' statement to the police regarding his presence at Greco Graphics on June 17th. Offering the alibi defense would have placed Mr. Rhoads about ten minutes away from the murder scene near the time of the murder. The State might have been able to show that Mr. Rhoads committed the murder and then drove to Greco Graphics to either manufacture an alibi and/or dispose of evidence.[6]

The defense Mr. Valenti offered was not outside the realm of sound trial strategy given the obstacles an alibi defense presented. While Mr. Valenti's defense required the judge to both believe and disbelieve Ms. Leavy (*e.g.* she was telling the truth about not noticing blood on Mr. Rhoads' clothing and hands, but lying about Mr. Rhoads' confession), such a situation is not unusual for the criminal defense lawyer. Also, while an alibi defense certainly might have had some advantages,[7] the possible detrimental effect of offering the defense was extreme. Under the circumstances, Mr. Valenti's decision not to offer an alibi defense "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

B. *Failure to Cross–Examine or Seek Discovery.*

Mr. Rhoads also argues his counsel was ineffective for failing to cross-examine Ms. Leavy about a possible agreement she had with the State and failing to seek discovery on Ms. Leavy's criminal background. On April 26, 1990, Ms. Leavy was arrested for aggravated assault. (Amend.Ex. A). Bond was set on May 4, 1990, and the case was continued until July 11, 1990. On June 21,

---

**6.** Mr. Valenti essentially testified that is what happened.

**7.** It would have contradicted Ms. Leavy's testimony about the events that occurred after leaving Henry Horner Park.

1990, the police interviewed Ms. Leavy regarding Mr. Heitlage's murder. Ms. Leavy testified before the grand jury on June 22, 1990. (Amend. Ex. B at 130 & 140). On July 11, 1990, Ms. Leavy failed to appear in court. The State dismissed the case against her and forfeited her bond.

Mr. Rhoads believes the State told Ms. Leavy her assault case would be dismissed as long as she testified against him at trial. Mr. Rhoads also believes Mr. Valenti was present when Ms. Leavy's assault charge was dismissed because Mr. Rhoads was arrested with Ms. Leavy, also had a status on July 11, 1990, and asked Mr. Valenti to represent him in court on that day. Mr. Rhoads argues Mr. Valenti's failure to seek discovery and cross-examine Ms. Leavy about the dismissal of the aggravated assault case was ineffective assistance of counsel. These ineffectiveness arguments were also the subject of the evidentiary hearing.

Mr. Valenti testified that Mr. Rhoads told him he was charged in another case involving a battery. Mr. Valenti also testified, however, that Mr. Rhoads never told him about Ms. Leavy's aggravated assault case. Mr. Valenti stated that he had no knowledge that Ms. Leavy had a pending aggravated assault case at the time she testified before the grand jury or that on July 11, 1990, Ms. Leavy failed to appear in court and that the State dismissed the case without seeking a warrant for Ms. Leavy.

Mr. Rhoads testified that he told Mr. Valenti in late July, 1990, that both he and Ms. Leavy had been arrested for battery on the same individual and that the case was pending in court. According to Mr. Rhoads, he asked Mr. Valenti to go to court to take care of the battery case. Mr. Rhoads stated that about a month later he again talked to Mr. Valenti about the battery case. According to Mr. Rhoads, Mr. Valenti told him that he had appeared in court on Mr. Rhoads' behalf and that the State had dropped the charges against Ms. Leavy. Mr. Rhoads also testified that Mr. Valenti told him that Ms. Leavy's assault case had nothing to do with his murder case and was not worth mentioning.

First, Mr. Rhoads stated he informed Mr. Valenti about the pending assault charge in late July, 1990, and that Mr. Valenti then appeared in court and witnessed the State drop the charge against Ms. Leavy. According to Mr. Rhoads' exhibits, however, the assault charge was stricken on leave to reinstate ("SOL") on July 11, 1990. (Habeas Amend. Ex. A). Thus, for all practical purposes, by late July, 1990, the case against Ms. Leavy had been dropped. Assuming Mr. Rhoads is correct with his dates, it would have been impossible for Mr. Valenti to witness the State dismiss Ms. Leavy's case because Mr. Valenti did not learn about the case until after it was dismissed.

Second, although Mr. Rhoads states Mr. Valenti appeared in court on his behalf in the battery case, the court records from that case do not indicate Mr. Valenti ever made an appearance on Mr. Rhoads' behalf. (Pet. Memo. in Support of Amend. Ex. A). Rather, the records indicate Mr. Rhoads' battery case was never called after July 11, 1990. Thus, there is no corroborating evidence that Mr. Valenti was in court at any time Mr. Rhoads' battery case or Ms. Leavy's assault case was called.

Additionally, having heard and seen Mr. Valenti, I do not believe he told Mr. Rhoads that Ms. Leavy's assault case had nothing to do with the murder case and that "it was not worth mentioning." It is highly unlikely Mr. Valenti would believe in or make such a comment regarding a fertile ground for cross-examination. Ignoring Mr. Rhoads' testimony, there is no evidence in the record that Mr. Valenti was aware Ms. Leavy was charged with aggravated assault or that the charge was stricken on leave to reinstate. Mr. Valenti testified he was unaware of the charge and the SOL. Accordingly, I do not find Mr. Valenti was deficient in failing to cross-examine Ms. Leavy regarding the assault charge. An attorney cannot cross-examine a witness about events outside the scope of the attorney's knowledge.

There is still the issue of whether Mr. Valenti was ineffective for failing to seek discovery regarding Ms. Leavy's criminal history. According to Mr. Valenti, he neither requested Ms. Leavy's criminal history from

the State nor attempted to obtain Ms. Leavy's criminal history from the Clerk's office. Mr. Valenti admitted he did not file a written motion for discovery. Mr. Valenti stated, however, that Judge Boharic, the judge overseeing Mr. Rhoads' murder case, carefully monitored discovery during the trial court proceedings and required the State to comply with statutory discovery obligations. Mr. Valenti also stated that, after reviewing the State's discovery filings, he sometimes requested additional documents from the State. Additionally, Mr. Valenti attempted to contact Ms. Leavy, but was informed by an assistant state's attorney that she did not want to meet with him.

In *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), the Supreme Court considered the actions of a defense lawyer who failed to request pretrial discovery from the state. The lawyer believed it was the state's obligation to inform him of its case against the defendant. *Id.* at 369, 106 S.Ct. 2574. The Court noted, as it did in *Strickland*, that lawyers have a duty to make reasonable investigations and that a reviewing court should assess counsel's overall performance throughout the case in order to determine whether counsel's deficiencies overcome the presumption of competent assistance. *Id.* at 384, 386, 106 S.Ct. 2574. In *Kimmelman*, the Court found the defense lawyer's performance deficient based on his total failure to conduct any pretrial discovery. *Id.* at 385, 106 S.Ct. 2574. There was no strategic reason offered for the failure to conduct discovery, but simply a misconception on the defense lawyer's part that the state was obligated to turn over all of its inculpatory evidence. *Accord Williams v. Washington*, 59 F.3d 673, 676 (7th Cir.1995)(finding a defense lawyer rendered ineffective assistance by failing to seek discovery of any of the state's evidence, file any pretrial motions, read a key piece of evidence that had been in his files for six months, seek to discredit a co-defendant's confession, and call witnesses that would have cast doubt on the victim's veracity); *Pilchak v. Camper*, 741 F.Supp. 782, 792–95 (W.D.Mo.1990)(finding defense counsel's failure to conduct any pretrial discovery constituted ineffective assistance of counsel).

■■■ "*Strickland* requires [a court] to focus, not upon whether counsel could have done a better job, but upon whether counsel provided the assistance necessary to ensure the fundamental fairness of the proceeding whose result is being challenged." *Resnover v. Pearson*, 965 F.2d 1453, 1460 (7th Cir. 1992). While it is undoubtedly true that if Mr. Valenti had Ms. Leavy's criminal background he could have conducted a better cross-examination, his failure to seek discovery on Ms. Leavy's criminal background did not render Mr. Rhoads' trial fundamentally unfair or Mr. Valenti's performance ineffective. Mr. Valenti sought and received discovery under the supervision of Judge Boharic. Mr. Valenti requested documents in addition to those submitted by the State.[8] While Mr. Valenti should have filed a written motion for discovery, in accord with Illinois Supreme Court Rule 412(a),[9] he was under the impression that the State was meeting its discovery obligations and responding to his discovery requests. Accordingly, Mr. Rhoads' ineffective assistance of counsel claim is denied.

---

8. Mr. Valenti also attempted to interview Ms. Leavy, although Ms. Leavy turned down his request. In Illinois, prosecution witnesses need not grant interviews to defense counsel. *People v. Peter*, 55 Ill.2d 443, 303 N.E.2d 398, 404 (Ill.1973). It is impermissible for the State to advise a witness to refrain from talking to defense counsel. Ill. S.Ct. Rule 415(a). Mr. Rhoads does not allege the State advised Ms. Leavy not to talk to Mr. Valenti.

9. It is unclear whether Mr. Valenti would have learned of Ms. Leavy's aggravated assault charge even if he had filed a written motion for discovery under Rule 412. Rule 412 only requires the State to turn over its witnesses' prior criminal convictions. Ms. Leavy, however, was never convicted of the aggravated assault charge. *Accord People v. Higgins*, 71 Ill.App.3d 912, 390 N.E.2d 340, 353, 28 Ill.Dec. 173, 186 (1st Dist. 1979).

Mr. Rhoads argues the State had a deal with Ms. Leavy that it would dismiss the assault charge if Ms. Leavy testified. If this were true, the deal would have been *Giglio* material and discoverable by a written motion. The record, however, is wholly devoid of any evidence such a deal existed.

*Discovery*

Mr. Rhoads argues for the first time in his habeas petition amendment that the State improperly failed to disclose the circumstances surrounding the dismissal of Ms. Leavy's aggravated assault claim. Since the claim is procedurally defaulted, Mr. Rhoads must prove either cause and prejudice for the default or that failure to consider the claim will result in a fundamental miscarriage of justice.

 An agreement between the State and Ms. Leavy for her testimony is not new evidence of innocence. Thus, there is no fundamental miscarriage of justice by failing to consider the claim. *Accord Schlup,* 513 U.S. at 316, 115 S.Ct. 851.

As noted above, "cause" is ordinarily defined as an external objective factor that impeded the defense's ability to raise the claim. *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). If Mr. Rhoads did not become aware of the factual basis for his claim, that the State failed to turn over an agreement with Ms. Leavy, until after he exhausted his State appeals, it would have been impossible for him to raise the claim during his Illinois state court proceedings. The claim would not be barred.[10]

 Mr. Rhoads argued at his post-conviction hearing that his trial counsel was ineffective for failing to inquire into the dismissal of Ms. Leavy's aggravated assault case. (Post–Conviction Tran. at A–7). At the time of the post-conviction hearing, the State's discovery response, filed on December 19, 1990, was in the record. (Amend.Ex. C).[11] Thus, at the post-conviction stage, the grounds for Mr. Rhoads' discovery claim against the State were in the record. Mr. Rhoads knew the State dismissed an aggravated assault claim against Ms. Leavy and knew that the State had not disclosed Ms. Leavy's arrest record or any agreements with Ms. Leavy. Mr. Rhoads fails to offer any evidence to support his claim that did not

already exist at the time of the post-conviction proceedings. Thus, no external impediment existed that prohibited Mr. Rhoads from raising this claim, at the latest, in his Illinois petition for post-conviction relief. Accordingly, Mr. Rhoads can not show "cause" and his claim is barred.

*Conclusion*

For the reasons stated above, Mr. Rhoads' habeas corpus petition is denied.

---

10. This is a generous reading of the habeas petition amendment. Although represented by counsel at the time the amendment was filed, Mr. Rhoads has not presented any reason for his failure to raise this claim at the state level.

11. This was also established at the evidentiary hearing.